UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HOWARD AYERS,

                              Plaintiff,

v.                                                          9:17-cv-01229
                                                            (DNH/TWD)

ZACHARIE TROMBLEY and HENRY BERNIER,

                              Defendants.
_____

APPEARANCES:                              OF COUNSEL:

HOWARD AYERS
Plaintiff, *pro se*
502 W. 213 Street 3C
New York, NY 10034

HON. LETITIA JAMES                        MATTHEW P. REED, ESQ.
Attorney General of the State of New York  Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**ORDER AND REPORT-RECOMMENDATION**

## I.    INTRODUCTION

*Pro se* Plaintiff Howard Ayers, a former inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), commenced this civil

rights action under 42 U.S.C. § 1983 asserting claims arising out of his confinement at Bare Hill

Correctional Facility ("Bare Hill") in 2016.  (Dkt. No. 1.)  Plaintiff's First Amendment free

exercise claims against Defendants Trombley, the Food Service Administrator, and Bernier, a

civilian cook, and a First Amendment retaliation claim against Trombley survived initial review conducted pursuant to 28 U.S.C. §§ 1915e and 1915A.  (Dkt. No. 4.)

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (Dkt. No. 19) on the following grounds: (1) Plaintiff failed to exhaust administrative remedies on his First Amendment retaliation claim; (2) Plaintiff's First Amendment retaliation claim fails as a matter of law; and (3) Defendants are entitled to qualified immunity on Plaintiff's First Amendment free exercise claims.  (Dkt. No. 19-1.)  Plaintiff has filed a response.  (Dkt. No. 23.)  For the reasons explained below, the Court recommends that Defendants' summary judgment motion be granted in part and denied in part.

## II.    BACKGROUND

### A.    The Holy Day of Atonement

Plaintiff is a practicing Muslim who "has physically participated in the religious celebration of the Holy Day of Atonement as required each year" leading up to 2016.  (Dkt. No. 1 at 4.[1])  In 2016, the Holy Day of Atonement was to be observed (as noted in the DOCCS yearly religious calendar) between October 15 and October 16.  *Id*. at 4, 14-16.  This religious calendar states that the Holy Day of Atonement is an "optional fasting event [that] begins at sunset on October 15 and is broken at sunset the evening of October 16.  The offenders are afforded the opportunity to have an in-house program.  **Offenders are off work and programs**

---

[1]  Page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.  Unless noted, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

on the 16th only.  (MC include pre-dawn bag for those fasting, OWP, SC = prayer).ʺ  *Id.* at

15  (emphasis in original).[2]

According to Plaintiff, the Holy Day of Atonement "is a day that the Honorable Mr.

Louis Farrakhan designated as a day of the Eight Steps of Atonement for us to stop and look and

focus on ourselves."  (Dkt. No. at 19-5 at 24.)  He explained:

> We fast the day before.  And on the day of the event, which is the
> 16th, we go into festivities, such as we start off -- it's set up as a
> festival.  We start off as a service.  At noon before you eat the
> meal, you go in to noon prayer.  Then you eat the meal.  And then
> there's entertainment.

*Id.* at 26.  Plaintiff further testified:

> Q:  Does the Holy Day of Atonement have a mandatory fast, or can
> you still observe the day but not fast?
>
> A:  In the Holy Day of Atonement, if you participate in the Holy
> Day of Atonement, you have to fast.  If you -- the only difference
> between Holy Day of Atonement and Ramadan is that you're not
> obligated.  But if you agree to participate, you have to fast.  You
> have to go through the procedures.  If you're not participating, then
> it's another day for you.

*Id.* at 26.  Plaintiff explained the pre-dawn meal, or Suhoor bag, is provided the "night before"

and "normally" consists of "two cereals, six sugars, two jellies[,] . . . piece of fruit, two milks, six

breads."  (Dkt. No. 19-3 at 28-29.)  It is undisputed that Plaintiff was not provided with a pre-

dawn meal for the Holy Day of Atonement in 2016.  (Dkt. Nos. 1 at 9; 19-4 at ¶¶ 10-17.)

## B.    Defendants' Declarations

Trombley is currently employed by DOCCS at Clinton Correctional Facility in the

position of Deputy Superintendent of Administration.  (Dkt. No. 19-5 at ¶ 1.)  Previously, and

---

[2]  *See also* Dkt. No. 19-5 at 17 ("2016 Bare Hill CF Special Events and Import Religious Dates
Calendar" defining, *inter alia*, the following terms: (1) MC – Meal Consideration; (2) OWP –
Off Work and Program; and (3) SC – Special Consideration.)

relevant to this action, from 2005 through 2017, Trombley was the Food Service Administrator at Bare Hill. *Id*. at ¶ 2. Since 2014, Bernier has been employed by DOCCS as a civilian cook at Bare Hill. (Dkt. No. 19-4 at ¶ 1.)

Defendants explain that DOCCS Directive 4202 provides the rules, regulations, and procedures for Religious Programs and Practices held in DOCCS facilities. (Dkt. No. 19-2 at ¶ 5.) For special events or holidays, it is the responsibility of the designated chaplain to plan for the event. *Id*. at ¶ 6. Inmates must notify their respective chaplain should they wish to participate in a holy day event by the deadline provided on the annually printed religious calendar. *Id*. at ¶ 7. The chaplain designates the inmates who desire to participate, and provides a roster of participating inmates with the event packet to the facility's Deputy Superintendent for Programs no later than forty-five (45) days prior to the event. *Id.* at ¶ 8. If a special event requires meal considerations, the facility food services department will follow the directions provided by the chaplain in the event packet. *Id.* at ¶ 9.

Pursuant to DOCCS Directive 4202, a list of inmates wishing to participate in the Nation of Islam ("NOI") Holy Day of Atonement was to be submitted to the Bare Hill chaplain no later than August 17, 2016. *Id*. at ¶ 12. The inmate facilitator submitted the list of inmates on September 28, 2016, forty-two (42) days late. *Id.* at ¶ 13. Plaintiff testified that Bare Hill agreed to prepare for the Holy Day of Atonement despite the purported untimely submission of the list of participants. (Dkt. No. 19-3 at 158.) The 2016 Special Event Packet, authored by ministerial services, listed the Bare Hill inmates participating in the Holy Day of Atonement, including Plaintiff. (Dkt. No. 19-5 at 10.)

**C.    October 13, 2016**

According to Plaintiff, on October 13, 2016, Trombley requested that Plaintiff and

another inmate assist him in the kitchen with removing food items from a freezer and placing

them in a cooler in preparation for the Holy Day of Atonement.  (Dkt. No. 1 at 6.)  Trombley

also directed Plaintiff and the other inmate to "place the religious pre-dawn items inside of

another cooler and marked [sic] the items 'NATION OF ISLAM HOLY DAY OF

ATONEMENT MEAL, FOR OCT. 15, 2016."  *Id*.  Trombley and Plaintiff "personally counted

out" various food items "for the religious pre-dawn meal bags[,]" and these "items were marked

NOI for Oct. 15, 2016."  *Id*.  Similarly, Plaintiff testified that on October 13, 2016, he was:

> called from program, to set up -- pick up the items . . . to pick up
> items with, not a cook, but with the food service manager, Mr.
> [Trombley].  We picked up the items from various parts of the
> facility; the freezer, the cooler.  We put everything in one area so it
> would be easily accessed to who come to do the bags.  So we
> counted everything and put everything in there.  So some of the
> things I counted personally and some of the things he counted and
> we agreed that everything was -- we had enough.  He had a list of
> people and we went off of this list.

(Dkt. No. 19-3 at 32-33.)  Plaintiff also testified that the list, marked as Exhibit 2 during his

deposition, appeared to be the same list of inmates in redacted form that Plaintiff and Trombley

used to prepare the pre-dawn meal bags on October 13, 2016.  *Id*. at 33-34.  Plaintiff further

testified:

> Q:  So the day, on the 13th, when you were pulling the food out
> with Defendant Trombley, you were pulling -- you say you were
> pulling the food for the Suhoor bags, which is the cereals and the
> sugars and the juices and jellies and toast or bread, and then you
> were pulling out this chicken to defrost, basically, for the evening
> meal?
>
> A:  Right.  I think we pulled out chicken.  There was a cake
> involved.  We pulled out a couple of items that we had purchased

that were not a part of the list.

*Id*. at 36-37.

Trombley, however, does not recall preparing the pre-dawn meals on October 13, 2016. (*See* Dkt. No. 19-5 at ¶ 20.)  Specifically, Trombley states that "[a]lthough plaintiff alleges in his complaint that he and I set aside food for the pre-dawn meals on October 13, 2106, I have no recollection of that taking place, and there is not documentation in the possession of any party or DOCCS, indicating that occurred."  *Id*.[3]  Similarly, Bernier states, "[a]lthough plaintiff alleges in his complaint that he and defendant Trombley prepared and set aside pre-dawn meals on October 13, 2016, I was not aware of this, nor was I present for any alleged preparation of the meal bags plaintiff discusses in his complaint."  (Dkt. No. 19-4 at ¶ 12.)

In his response to Defendants' motion, Plaintiff has submitted a sworn affidavit of a former DOCCS inmate stating, among other things, that:

> On October 13th, 2016 defendant Trombley directed myself and plaintiff Ayers, to help him (Defendant Trombley) set aside the religious food items for the Holy Day of Atonement.
>
> On October 13, 2016 the food items that myself and Plaintiff Ayers were directed to set aside by defendant Trombley including the religious pre-dawn meal for October 15, 2016.
>
> I'm ready and willing to testify to the fact that on October 13th, 2016 at the Bare Hill Facility defendant Trombley did in fact direct myself and plaintiff Ayers to set aside religious food items for the Holy Day of Atonement that included the religious pre-dawn meal.

(Dkt. No. 23-2 at ¶¶ 1, 4, 5.)

---

[3]  The Court notes that in an October 18, 2016, memorandum addressed to "C. Lamore, IGRC," from "Z. Trombley, FSA II," regarding "Combined Grievance Complaints" of Plaintiff and [redacted inmate], Trombley states, *inter alia*, "I was not aware of a pre-dawn bag or that that a Commissary purchased order was submitted for this NOI event prior to Mr. Bernier calling me at home on 10/15/16.  I did instruct Mr. Bernier to follow the direction in the memo."  (Dkt. No. 19-3 at 165.)

### D.    October 15, 2016

Plaintiff claims that on October 15, 2016, Bernier was "appointed to oversee" Plaintiff and the other inmate cooks for the Holy Day of Atonement.  (Dkt. No. 1 at 7.)  When Plaintiff arrived in the kitchen area, Bernier advised Plaintiff that Trombley, Bernier's boss, had determined that "there would be no pre-dawn religious meals issues to any of the Nation of Islam inmates[s]."  *Id*.  Plaintiff questioned Bernier about this statement, advised him about the preparation he undertook with Trombley on October 13, 2016, and told Bernier that a refusal to provide Plaintiff with his pre-dawn religious meal was a violation of plaintiff's "religious rights as a practicing Muslim[.]" *Id*.  Plaintiff then left the kitchen area and returned with the religious calendar for the Nation of Islam and showed Bernier the observance description.  *Id*.

Nevertheless, Bernier continued to refuse to provide Plaintiff with his religious meal.  *Id*. at 7.  Plaintiff requested to speak with a sergeant "to have this matter corrected."  *Id.*  Thereafter, a sergeant arrived in the kitchen area and reviewed the calendar.  *Id*.  Plaintiff testified:

> The sergeant came.  We explained to the sergeant.  We showed the sergeant our information.  He said, "Where's their meal?"  It's one of the menus.  He says, "They fasting.  There's the paper.  These are the guys.  You got the cooks, so it's obvious they're fasting." [Bernier] said, "Well, my boss said nothing about the matter because they don't say it on here."

(Dkt. No. 19-3 at 39.)

The Sergeant directed Bernier to call Trombley.  (Dkt. No. 1 at 7.)  Bernier called Trombley at home, in the presence of Plaintiff, the sergeant, and the other inmate.  *Id*.  Bernier informed Trombley about the statement in the religious calendar and, in response, Trombley told Bernier that he was not to provide the pre-dawn bags but to instead advise Plaintiff to file a grievance that Trombley would "deal with . . . on Monday."  *Id*.

According to Bernier, on October 15, 2016, Plaintiff was one of the inmates assigned to assist with the preparation of the celebratory meal that is given at the conclusion of the Nation of Islam Holy Day of Atonement.  (Dkt. No. 19-4 at ¶ 10.)  Upon Plaintiff's arrival to the kitchen area in Bare Hill, Plaintiff asked for his pre-dawn meal bag.  *Id*. at ¶ 11.  Bernier informed Plaintiff that no pre-dawn meal bags would be issued.  *Id*.  Bernier notes that as referenced in the Special Events Packet, a pre-dawn meal bag was not specified.  *Id*. at ¶ 12.  After Plaintiff questioned Bernier's instruction that no pre-dawn meal bags were being provided, a sergeant was called to the kitchen area.  *Id*. at ¶ 14.  The sergeant instructed Bernier to call Trombley, his supervisor, to clarify the need for the pre-dawn meal bag.  *Id*.  Bernier explains:

> In speaking with Defendant Trombley, I was advised no pre-dawn meal bags would be issued as the instructions given on the Special Event Packet by Ministerial Services did not specify a pre-dawn meal was required.  Defendant Trombley instructed me to follow the Special Event Packet.  At the completion of my phone call with Defendant Trombley, I followed his direction and repeated my instruction to plaintiff, that there would be no pre-dawn meal bags provided for the Holy Day of Atonement.  I did not know then, nor do I know now, whether a pre-dawn meal bag is necessary for the inmates celebrating the Nation of Islam Holy Day of Atonement in 2016 at Bare Hill.  I simply adhere to the details provided by Ministerial Services and my supervisor.

*Id*. at ¶¶ 15-18.

In his declaration, Trombley explains that:

> The 2016 Religious Menu for the Nation of Islam Holy Day of Atonement lists only the evening meal.  [*See* Dkt. No. 19-5 at 11.] There is no reference to a pre-dawn meal.  The Nation of Islam Holy Day of Atonement Special Event Packet, prepared by Ministerial Services, did not indicate that inmates would be fasting or need a pre-dawn meal.
>
> During the evening of Saturday, October 15, 2016, Bernier, a civilian cook, contacted me at my home regarding the Nation of Islam Holy Day of Atonement and the pre-dawn meal.  I informed Defendant Bernier that the Special Event Packet prepared by

Ministerial Services did not indicate that a pre-dawn meal was required and I instructed Defendant Bernier to follow the direction prepared in the Special Event Packet.

(Dkt. No. 19-5 at ¶ 19.)

Plaintiff claims that the refusal to provide him with his pre-dawn meal "violated . . . [his] right to freely practice his religious faith" because "the consumption of [the] religious meal for the Holy Day of Atonement religious observance was and remains to be a critical part of [Plaintiff's] . . . religious beliefs as a practicing Muslim[.]"  (Dkt. No. 1 at 8-9.)

### E.    Grievance No. BRL-14468-16

On October 15, 2016, Plaintiff filed Grievance No. BRL-14468-16, stating he was not provided with a pre-dawn bag for the Holy Day of Atonement on October 15, 2016, as stated on page 25 of the Ministerial Service years religious calendar.  (Dkt. No. 19-3 at 160-61.)

Plaintiff states that on October 17, 2016, Plaintiff and another inmate met with Trombley in his office.  (Dkt. No. 1 at 10.)  Plaintiff claims that during the meeting Trombley "attempted to push the religious issue under the table by pointing the finger at Bernier," accusing him of failing to follow the DOCCS religious calendar.  *Id*.  Trombley also stated that Bernier "misunderstood" his instruction, which was to provide the pre-dawn religious meals.  *Id*.  Trombley then stated his understanding that Plaintiff and the other inmate had filed a grievance, which Trombley said was not "needed."  *Id*.  Plaintiff responded by advising Trombley that he was present during the telephone conversation between Trombley and Bernier, and heard Trombley tell Bernier not to provide the pre-dawn religious meals.  *Id*.  According to Plaintiff, Trombley then asked Plaintiff how he could "fix this conflict" and stated that the grievance "is only going to cause you problems, and the Nation of Islam problems[.]"  *Id*.  Despite Trombley's threat, Plaintiff refused to withdraw the grievance.  *Id*. at 11.

According to Trombley, he called Plaintiff and the other inmate to his office regarding the combined grievance they authored.  (Dkt. No. 19-5 at ¶ 25.)  During the meeting:

> Plaintiff expressed concern that the Special Event Packets prepared by Ministerial Services had not been completed in a timely manner.  In speaking with Plaintiff, he understood food services was following the direction given in the Special Event Packet for the 2016 Holy Day of Atonement.
>
> In no way did I imply that Plaintiff should rescind the grievance filed against me, nor did I threaten the Nation of Islam community at Bare Hill.

*Id*. at ¶¶ 25, 26.

Plaintiff also testified that he was called down to a sergeant's office on two occasions to discuss the grievance.  (Dkt. No. 19-3 at 70.)  During the meetings, Plaintiff claims he was told to "drop" the grievance and that the denial of the pre-dawn bag meal was "an error" and that he and Trombley needed to "talk and resolve" the issue.  *Id*.  Although Trombley was not present during these meetings with the sergeant, Plaintiff "got the impression" that it was at Trombley's direction.  *Id*.  Plaintiff further testified that "we started going through unnecessary problems . . . we was 'on the burn,' we was being put on the burn because of the grievance."  *Id*. at 68.

On October 29, 2016, Plaintiff was interviewed by non-party Lieutenant White at Bare Hill.  (Dkt. No. 19-2 at ¶ 38.)  Plaintiff claims that during this interview "a chain" was "placed around his neck over the filing of the grievance[.]"  (Dkt. No. 1 at 11.)  Plaintiff testified that he believed Trombley ordered Lieutenant White to place the chain around his neck because he filed the grievance.  (Dkt. No. 19-3 at 68, 73, 81.)

On November 10, 2016, the Superintendent of Bare Hill issued the following response:

> The above-referenced grievance has been investigated.  It should be noted that three (3) inmates filed a grievance in regard to the NOI Holy Day of Atonement, all with similar complaint.  As a

result, all three grievances were combined into this "Like Grievance".

The grievants allege that they were not provided with Pre-Dawn Bags for the NOI Holy Day of Atonement and were denied same by Food Service staff. The grievants requested that all staff involved be held accountable for their actions, the reason for denial of the Pre-Dawn Bags be established and Religious staff be properly trained on organizing/setting up religious events packages.

An investigation was conducted by supervisors and it was initially identified that population did not sign up in a timely manner for this event. The event was scheduled for October 15th and 16th. The memorandum prepared by staff for the event is dated 9/1/16; however, it was determined this was a typographical error as the list of participants was provided to the Chaplain on 9/28/16, which was well outside the 45-day sign up time frame. Staff still attempted to conduct the festival even though it was very short notice. Staff inadvertently left out the statement on the packet to provide Pre-Dawn Bags.

Although there was no malfeasance noted on the part of staff, as the Pre-Dawn Bags were inadvertently omitted, the grievance is granted in part as staff have been reminded of the importance of proper set-up/organization of all religious events.

*Id*. at 158. On August 30, 2017, the Central Office Review Committee ("CORC") unanimously accepted in part the grievance, stating, *inter alia*:

CORC asserts that the NOI Holy Day of Atonement has an optional fast and there are no provisions in the Religious menu for a pre-dawn bag, only food for the evening meal is indicated. In addition, CORC notes that there was confusion regarding the event packet and where the event was to be held. FSA T . . . denies refusing the NOI population access to the food ordered from an outside source for the event. CORC has not been presented with sufficient evidence of malice or discrimination by staff.

CORC notes that grievants [ ] and Ay . . . have since been transferred.

*Id*. at 157 (ellipsis in original).

In his declaration, Trombley unequivocally denies retaliating against Plaintiff. (Dkt. No. 19-5 at ¶¶ 6-8.) Trombley swears he "did not harass Plaintiff, retaliate against him or his religious group, or cause other DOCCS employees to harass and assault Plaintiff." *Id*. at ¶ 8.

### F.    Upstate Correctional Facility

On November 2, 2016, days after the alleged "chain" incident, Plaintiff was transferred from Bare Hill to Upstate Correctional Facility ("Upstate"), where he remained until December 19, 2016. (Dkt. No. 19-6 at 12.) Plaintiff testified:

> Q: So did you -- you say you were transferred further thereafter [filing Grievance No. BRL-14468-16]. Did you grieve the retaliation or file a complaint, or anything like that?
>
> A: I filed the complaint. I filed the complaint with the director of disciplinary. I filed a complaint with the governor. I filed several complaints.
>
> Q: Just letters; right?
>
> A: Yes.
>
> Q: Did you do anything with IDRC [sic], the inmate grievance committee?
>
> A: Yeah, the grievance committee, which is not a big -- I filed a grievance in Upstate; they never responded to it. They never -- they never sent me -- in Upstate, they send you a memo now; they used to send you when you filed a grievance, they immediately give you a number. They refused to give me the number, or anything. They said the lady would make rounds, or the grievance sergeant would make rounds. When they made rounds, they didn't have my grievance or they didn't know what I was talking about. So my letters went to the director and the other letter went to the governor.
>
> Q: So those letters you just mentioned, those were after you tried to grieve it?
>
> A: Right.
>
> Q: Did you -- you didn't try to appeal -- there's a provision in the grievance directive if you don't get a response, you can appeal

directly to the superintendent; right? So did you write to the
superintendent?

A: No, I wrote directly to Albany, because I know what was going
on there.

Q: To Central Officer Review Committee in Albany or --

A: To the director of disciplinary, because I was there on the same
disciplinary charges. I was there on some charges, disciplinary
charges from this incident.

Q: So Mr. Venetozzi?

A: Right.

Q: So not through formal grievance channels; you just filed a
written letter?

A: Right.

(Dkt. No. 19-3 at 72-74.)

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 251-52 (1986). The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence that no genuine issue of material fact

exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to

produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d

at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the

[plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

"Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue

of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See*

*Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible

evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit

reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury

could reasonably find for the plaintiff."  "To defeat summary judgment, . . . nonmoving parties

may not rely on conclusory allegations or unsubstantiated speculation."  *Id.*  "At the summary

judgment stage, a nonmoving party must offer some hard evidence showing that its version of

the events is not wholly fanciful."  *Id.* (citation and internal quotation marks omitted).  "[T]o

satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory

allegations."  *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted).

"Statements that are devoid of any specifics, but replete with conclusions, are insufficient to

defeat a properly supported motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196

F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all

ambiguities and draw all reasonable inferences against the moving party.  *Major League*

*Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is

proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally,

and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).[4]

## IV. PLAINTIFF'S FAILURE TO COMPLY FULLY WITH N.D.N.Y. L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3).[5] (*See* Dkt. Nos. 19-2; 23.)

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement to which Plaintiff has not properly responded will be accepted as true (1) to the extent they are supported by evidence in the record,[6] and (2) the nonmovant, if proceeding *pro se*, has been

---

[4] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[5] L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

[6] L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1 800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of

specifically advised of the possible consequences of failing to respond to the motion.[7] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire record.

## V.    DISCUSSION

### A.    First Amendment Retaliation Claim Against Trombley

Courts must approach claims of retaliation "'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation–can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the

---

a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[7] Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 19 at 3.)

plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (quoting *Dawes*, 239 F.3d at 492.)

Liberally construed, Plaintiff alleges that he filed a grievance regarding the denial of his religious meal, was told by Trombley that he should withdraw the grievance in a threatening manner, and, at some point after he refused, had a "physical chain placed around his neck over the filing of the grievance." (Dkt. No. 1 at 10-11; *see also* Dkt. No. 4 at 11-12.) Defendants argue Plaintiff's retaliation claim against Trombley must be dismissed for failure to exhaust administrative remedies and on the merits. (Dkt. No. 19-1 at 10-20.) Because "[t]here is no question that exhaustion is mandatory under the Prison Litigation Reform Act of 1995 ("PLRA") and that unexhausted claims cannot be brought in court[,]" *Jones v. Bock*, 549 U.S. 199, 211 (2007), the Court addresses Defendants' exhaustion argument first.

      1.    <u>Legal Standards for Exhaustion</u>

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see, e.g.*, *Mateo v. O'Connor*, No. 10 Civ. 8426 (LAP), 2012 WL 1075830, at *6 (S.D.N.Y. Mar. 29, 2012) (finding a First Amendment retaliation claim "fits within the category of 'inmate suits about prison life,' and therefore must be preceded by the exhaustion of state

administrative remedies available to him.") (quoting *Lawrence v. Goord*, 304 F.3d 198, 200 (2d Cir. 2002)).

The PLRA requires "proper exhaustions," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly" (internal quotations omitted)). In New York State prisons, DOCCS has a well-established three-step Inmate Grievance Procedure ("IGP"). N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id.* § 701.5(a)(1). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility Superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the Superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS wide policy uses are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(1).

Third, a grievant may appeal to CORC within seven working days of receipt of the Superintendent's written decision. *Id.* § 701.5(d)(1)(1). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

There are also special procedures that may be used when the grievance involves a claim of staff misconduct. *Id.* § 701.8. A grievance alleging staff misconduct, once it is recorded and given a number, must be sent directly to the Superintendent, and the Superintendent must issue a decision within twenty-five days. *Id.* § 701.8(f). If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the Superintendent's decision within seven days of receipt of the decision. *Id.* § 701.8(h). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. *Id*. § 701.5. "Where the IGRC and/or Superintendent do not timely respond, an inmate must appeal 'to the next step,'" assuming there is another step in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. *Id.* § 701.6(g)(2)); *see also Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the Superintendent to timely respond to a grievance . . . can—and must—be appealed to the next level . . . to complete the grievance process.").

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cty. Of Orange*, 467 F. 3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps

that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.")) (internal quotations and citations omitted) (emphasis in original).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). More specifically, Section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies [.]") (quotations and citations omitted)).  In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of."  *Ross*, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA.  *Id.* at 1859-60.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.* at 1859.  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  *Id.*  Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 1860.

In *Williams v. Corr. Officer Priatno,* 829 F. 3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry.  *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691,695 (2d Cir. 2004), *overruled on other grounds*, *Woodford*, 548 U.S. at 94-95. Plaintiff must then establish that the IGP grievance procedure was unavailable to him. *See Jones*, 549 U.S. at 216.

    2.    <u>Analysis</u>

The undisputed record evidence establishes that Plaintiff did not appeal any grievances to CORC related to allegations of retaliation or assault that occurred between October 17, 2016, and November 2, 2016, at Bare Hill. (Dkt. No. 19-6 at ¶ 13.) Therefore, the Court finds Plaintiff failed to exhaust his administrative remedies under the IGP before commencing this lawsuit. *See Woodford*, 548 U.S. at 93.

This, of course, does not end the Court's inquiry with respect to exhaustion. Construed liberally, Plaintiff claims that the IGP process was unavailable to him. As noted above, on November 2, 2016, after the events giving rise to his retaliation claim, Plaintiff was transferred to Upstate. Plaintiff claims he "filed a grievance in Upstate; they never responded to it." (Dkt. No. 19-3 at 73.) He surmised that his grievance "probably went in the garbage can" because "Upstate don't want to deal with Bare Hill." *Id*. at 78. Plaintiff further testified:

> Q: So it's fair to say you didn't follow the grievance process for the retaliation claim?
>
> A: No, I don't want to say that. I want to say that I filed a grievance and that they didn't want to acknowledge that I was claiming that a chain had been put around my neck. That's basically why they didn't follow up on the grievance.
>
> Q: But you filed grievances in the past; right?
>
> A: Right.
>
> Q: And you're familiar with how to appeal them?

A:  Yeah.

Q:  And you know that if you don't get a response -- in other words, if they're not acknowledging your grievance at the initial level, you have a right to immediately appeal a nonresponse to the superintendent; right?

A:  Yeah.

Q:  And you didn't, you chose not to do that?

A:  No, I filed -- I wrote the lady in Upstate – it's a female.  I wrote the lady in Upstate, and when she didn't respond back, she made her rounds.  She stopped at my door.  And at the door, she said is, "There's nothing on file, that you filed.  You want to tell me, I'll file a grievance."

I showed her and she wanted my copy, she wanted me to give her my copy to make a copy.  And I said, "No, I filed the grievance already."  So she said, "Well, I'm gonna look into it."  And she never looked into it.

*Id*. at 74-75.  He continued:

Q:  And when she didn't look into it, though, you did not write the superintendent?

A:  No, I didn't write the superintendent in that jail.  That would only lead to more problems.  I just wrote directly to the director in Albany, and then I wrote a copy complaint to the governor's office, who then forwarded to DOCCS, who then had a lieutenant interview me, and then a sergeant at Franklin interviewed me.  And then a decision was made by the superintendent at Bear [sic] Hill: Your allegations cannot be substantiated, there's no witnesses.  The same red tape.

Q:  But you would agree that Directive 4040, that governs grievances, says you should have written to the superintendent -- right? -- when you didn't at [sic] response from the woman at Upstate?  That's the next step?

A:  Yeah, that's probably what the directive say.  I'm somewhat familiar with 4040.  It may have said that.

*Id*. at 76.

Consequently, Defendants contend even assuming, *arguendo*, that Plaintiff's grievance at Upstate was mishandled, Plaintiff understood the grievance process and knew his obligation was to next appeal the purported lack-of-response to Upstate's superintendent.  (Dkt. No. 19-1 at 14.)  The Court agrees.

Here, the undisputed facts in this case reveal that with respect to his First Amendment retaliation claim against Trombley, Plaintiff failed to fully comply with the IGP prior to the commencement of this action, despite those remedies remaining available to him at all relevant times.  Plaintiff alleges he filed a grievance regarding the retaliation, but he acknowledges he never filed an appeal to the superintendent when he did not get a response.  Therefore, the Court recommends that Defendants' motion for summary judgment be granted on this procedural basis.[8]

### B.    First Amendment Free Exercise Claims Against Trombley and Bernier

Plaintiff's First Amendment Free Exercise claims against Trombley and Bernier arising out of their refusal to provide Plaintiff with a pre-dawn religious meal on October 15, 2016, survived initial review.  (Dkt. No. 4 at 7-9.)  Defendants seek summary judgment solely on qualified immunity grounds.  (Dkt. No. 19-1 at 18-22.)  Plaintiff argues Defendants are not entitled to qualified immunity because they violated his constitutional rights and requests that his First Amendment Free Exercise claims against Trombley and Bernier proceed to trial.  (Dkt. No. 23-3 at 8-13.)

---

[8]  In light of this recommendation, the Court declines to address Defendants' argument on the merits.  (Dkt. No. 19-1 at 14-20.)

1.    Legal Standards for Qualified Immunity

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)); *accord Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendants bear the burden of establishing qualified immunity. *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013), *cert. denied sub nom. Annucci v. Vincent*, 135 S. Ct. 948 (2015).

"To establish this defense at the summary judgment stage, the officers must show, based on undisputed facts, *either* that [their] conduct did not violate 'clearly established rights' of which a reasonable person would have known, or that it was 'objectively reasonable' [for them] to believe that [their] acts did not violate these clearly established rights." *Cantey v. Martuscello*, No. 9:17-CV-0284 (LEK/CFH), 2019 WL 1397006, at *2 (N.D.N.Y. Mar. 28, 2019) (quoting *Soares v. State of Conn.*, 8 F.3d 917, 920 (2d Cir. 1993)).

The Court must look to both "'the clarity of the law establishing the right allegedly violated' as well as 'whether a reasonable person, acting under the circumstances confronting a defendant, would have understood' that his actions were unlawful." *Id*. at *3 (quoting, *inter alia*, *Hanrahan v. Doling*, 331 F.3d 93, 98 (2d Cir. 2003)).  The "contours" of the right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Golodner v. Berliner*, 770 F.3d 196, 205 (2d Cir. 2014) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)).

2.    <u>Analysis</u>

It is undisputed that on October 15, 2016, Plaintiff did not receive a pre-dawn meal for the 2016 Holy Day of Atonement.  (Dkt. Nos. 1 at 9; 19-4 at ¶¶ 10-17.)  For purposes of this motion only, Defendants assume Plaintiff's right to freely exercise his religion was infringed by the lack of a pre-dawn meal for the 2016 Holy Day of Atonement.  (Dkt. No. 19-1 at 22.)  Thus, the relevant inquiry is whether it was objectively reasonable for Trombley and Bernier to believe that their actions did not violate that right.

An individual acts with objective reasonableness and is therefore protected under qualified immunity if "officers of reasonable competence could disagree on [the legality of the defendant's actions]."  *A'Gard v. Locke*, No. 9:14-CV-0613 (GTS/DEP), 2016 WL 8735653, at *7 (N.D.N.Y. June 24, 2016) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "Stated differently, a defendant has acted in an unreasonable manner only 'when no officer of reasonable competence could have made the same choice in similar circumstances.'"  *Id.* (quoting *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995)).  The objective reasonableness question should be evaluated based on the information the defendant possessed at the time of the conduct at issue, and regardless of the defendant's subjective beliefs.  *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

Defendants contend they were not objectionably unreasonable in their refusal to provide Plaintiff his meal because: (1) pursuant to DOCCS Directive 4202 it is the responsibility of the facility chaplain and ministerial services to plan religious events, identify the participating inmates, and direct food services regarding meal considerations; (2) as employees of food services, they are responsible for following the directions as conveyed in the Special Event Packet prepared by ministerial services; (3) they are not members of the NOI and are not familiar

with the specific requirement of that faith, its holiday, or its religious meals; (4) the 2016 Bare

Hill Special Event Packet indicated that the Day of Atonement was an optional fast; (5) the 2016

Special Event Packet did not specify that any inmates were fasting; (6) the meal considerations

included in the 2016 Special Event Packet indicated that a number of inmates planned to

participate in the Holy Day of Atonement, but only included the description of an evening meal;

and (7) there was no description or indication that a pre-dawn meal was required.  (Dkt. No. 19-1

at 22-23.)  Accordingly, Defendants contend they are shielded from liability based on qualified

immunity.

 "However, when 'there are facts in dispute that are material to a determination of

reasonableness,' dismissal on the basis of a qualified immunity defense is inappropriate."  *Brown*

*v. Brown*, No. 9:08-cv-0209 (DNH/GHL), 2010 WL 1186569, at \*10 (N.D.N.Y. Jan. 19, 2010)

(quoting *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)).  As discussed above, Plaintiff and

Defendants have offered different versions as to what transpired on October 13, 2016.  Plaintiff

claims that on October 13, 2016, Trombley requested Plaintiff's and another inmate's assistance

in the kitchen to prepare for the Holy Day of Atonement.  (Dkt. No. 1 at 6.)  They removed food

items from a freezer and placed them in a cooler.  (Dkt. No. 1 at 6.)  Plaintiff testified that they

"counted" out the food items "for the religious pre-dawn meal bags" and that they "put

everything in one area so it would be easily accessed to who come to do the bags."  (Dkt. No. 19-

3 at 32-33.)  Plaintiff testified Trombley "had a list of people and we went off of this list."  *Id*. at

33.

 Similarly in his complaint, Plaintiff states Trombley was aware that thirty-five (35)

inmates "signed up" to participate in the Holy Day of Atonement.  (Dkt. No. 1 at 6.)  Yet they

"provided 40 bags, just in case" other inmates requested a pre-dawn meal.  *Id.*  According to his

complaint, Trombley and Plaintiff:

> personally counted out 40 of each item and 80 (2 each) milks; 80
> (2 each) juice; 80 (2 each) individual bran flaxes boxes; 40 set of
> six slices of bread; 40 set of four slices of American cheese; all for
> the religious pre-dawn meal bags, for Oct. 15, 2016.  The items
> were marked NOI for October 15, 2016.

*Id.*

Plaintiff has also submitted a sworn declaration from an inmate who also claims that on

October 13, 2016, at Trombley's direction, they "set aside food items for the Holy Day of

Atonement that included the religious pre-dawn meal."  (Dkt. No. 23-2 at ¶ 7.)  Further, despite

preparing the pre-dawn meals on October 13, 2016, Trombley told Bernier not "to provide any

religious bags" on October 15, 2016.  *Id.* at ¶ 18.

For his part, Trombley has no recollection of setting "aside food for the pre-dawn meals

on October 13, 2016" with Plaintiff and notes "there is no documentation in the possession of

any party or DOCCS, indicating that occurred."  *Id.*  (Dkt. No. 19-5 at ¶ 20.)  Trombley further

states that on October 15, 2016, he informed Bernier "that the Special Event Packet prepared by

Ministerial Services did not indicate that a pre-dawn meal was required and [he] instructed []

Bernier to follow the direction prepared in the Special Event Packet."  *Id.* at ¶ 19.  In a

memorandum dated October 18, 2016, Trombley states, "I was not aware of a pre-dawn bag or

that a Commissary purchase order was submitted for this NOI event prior to Mr. Bernier calling

me at home on 10/15/16.  I did instruct Mr. Bernier to follow the direction in the memo."  (Dkt.

No. 19-3 at 165.)  Trombley further notes that "[a]lthough the Bare Hill Religious Calendar did

state 'MC [meal considerations] include pre-dawn bag for those fasting . . . .' it did not state that

fasting was mandatory."  (Dkt. No. 19-5 at ¶ 14.)

However, as Plaintiff points out, pursuant to DOCCS Directive 4202, the religious calendar prepared by Ministerial and Family Services "will also note if special accommodations, such as Off Work Program (OWP), Family Event (FE), and Menu Consideration (MC) are required" and "[t]here should be no deviation from these instructions without Central Office approval." (*See* Dkt. Nos. 23-1 at ¶¶ 11-12; 23-2 at 10, 21.) Thus, Plaintiff agues Defendants were "required to follow the instructions written" in the Bare Hill Religious Calendar, which clearly stated that it included "pre-dawn bags for those fasting." (Dkt. No. 23-1 at ¶ 11; *see also* Dkt. Nos. 23-2 at 10; 19-5 at ¶ 14.)

Additionally, CORC issued the following deicison on Grievance No. BRL-14468-16 finding, in relevant part, that:

> there was confusion regarding the [2016 Holy Day of Atonement] event packet and where the event was to be held. FSA T . . . denies refusing the NOI population access to the food ordered from an outside source for the event. CORC has not been presented with sufficient evidence of malice or discrimination by staff.

*Id.* at 157.

In his declaration, Bernier states that "although Plaintiff alleged in his complaint that he and Trombley prepared and set aside pre-dawn meals on October 13, 2016, I was not aware of this, nor was I present for any alleged preparation of the meal bags Plaintiff discusses in his complaint." (Dkt. No. 19-4 at ¶ 12.) Plaintiff testified, however, that Bernier knew the pre-dawn meal items had been prepared and he tried explaining the issue to Trombley over the telephone on October 15, 2016. (Dkt. No. 19-3 at 56-57.) Specifically, Bernier told Trombley, "they already took out--" but Trombley interrupted and stated, "Forget that. They're not getting the bag." *Id.* at 57.

Additionally, Plaintiff states that during the October 17, 2016, meeting in Trombley's office to discuss the grievance, Trombley told Plaintiff that Bernier simply "made a mistake" by not providing the Suhoor bags and asked what could be done to "fix" the issue. *Id.* at 56. Plaintiff responded, "No, it wasn't [Bernier]. It was you." *Id.* Plaintiff explained he heard their October 15, 2016, conversation because Bernier had called Trombley on speakerphone. *Id.* In response, Trombley suggested "we can put together the meal." *Id.* at 56. However, Plaintiff testified he told Trombley:

> It's over. The meal is over. There's nothing else for me to do . . . The Holy Day of Atonement is finished. It's done with. We had a chance to fix this on the 15th. We could have fixed this when Mr. B called you . . . we could have fixed this. When Mr. B called you, we had already tooken out the stuff. We had already tooken these items out. So it wasn't like Mr. B was going to go get these items. They was already in the cooler. We already took things out.

*Id.* at 56-57.

In light of the foregoing, the Court finds "there are facts in dispute that are material to a determination of reasonableness," including whether preparations for the pre-dawn meals were in fact made on October 13, 2016, and whether Defendants knew inmates celebrating the Holy Day of Atonement were to receive a pre-dawn meal on October 15, 2016.

Therefore, on this record, the Court finds consideration of Defendants' motion for summary judgment on the First Amendment free exercise claims on qualified immunity grounds to be premature. Viewing the facts in the light most favorable to Plaintiff, the Court cannot conclude that it was objectively reasonable for Trombley and Bernier to deny Plaintiff his pre-

dawn meal for the 2016 Holy Day of Atonement.  Therefore, the Court recommends denying Defendants' motion for summary judgment on qualified immunity grounds.[9]

## VI.    CONCLUSION

Based on the foregoing, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.  If the above recommendations are accepted and adopted by the District Court, only Plaintiff's First Amendment Free Exercise claims against Trombley and Bernier will remain for trial.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 19) be **GRANTED in part and DENIED in part**: and it is hereby

**RECOMMENDED** that the motion be **GRANTED** as to Defendant Trombley on Plaintiff's First Amendment retaliation claim based on exhaustion grounds; and it is further

**RECOMMENDED** that the motion be **DENIED** as to Defendants Trombley and Bernier on Plaintiff's First Amendment Free Exercise claims based on qualified immunity grounds; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

---

[9]  If the recommendation is adopted, the qualified immunity defense will remain available to Trombley and Bernier at trial "where it must be evaluated in light of the character and quality of the evidence received in court."  *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[10]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72.

Dated: July 8, 2019
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[10]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33 35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048 49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249 50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

 **\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*
It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and

execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

 **\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347 48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.

1     In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*
For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1075830
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Cesar MATEO, Plaintiff,

v.

Kevin O'CONNOR, Jeffrey Macisaac, Steven Purcell,
Richard Ward, J. Jarvis, Paul Guarino, Lieutenant
Laporto, Mark Royce, and New York State
Department of Correctional Services, Defendants.

No. 10 Civ. 8426(LAP).
|
March 29, 2012.

### MEMORANDUM OPINION AND ORDER

LORETTA A. PRESKA, Chief Judge.

*\*1* This is one of several actions Cesar Mateo
("Mateo"), a prisoner currently incarcerated at Sing Sing
Correctional Facility ("Sing Sing"), has brought *pro se*
against various New York State prison officials under
42 U.S.C. § 1983. In this case, Mateo is suing the
New York State Department of Correctional Services
("DOCS") and eight of its employees: Corrections
Sergeant Kevin O'Connor ("O'Connor"), Corrections
Officer Jeffrey Macisaac ("Macisaac"), Corrections
Officer Steven Purcell ("Purcell"), Corrections Officer J.
Jarvis ("Jarvis"), Corrections Lieutenant Richard Ward
("Ward"), Corrections Lieutenant Laporto ("Laporto"),
Corrections Captain Mark Royce ("Royce"), and Civilian
Maintenance employee Paul Guarino ("Guarino"). All of
these defendants worked at the Green Haven Correctional
Facility ("Green Haven") while Mateo was incarcerated
there.

Mateo's complaint alleges verbal and physical harassment
by O'Connor, Macisaac, Purcell, and Jarvis on August
21 and 22, 2008; the filing of a false inmate misbehavior
report ("IMR") by O'Connor, Macisaac, Purcell, Ward,
and Guarino on August 22, 2008; a biased disciplinary
hearing conducted by Laporto, Guarino and O'Connor
on September 3, 2008; and a biased appeal conducted by
Royce on September 9, 2008. Mateo claims these actions
directly violated his civil rights under the Fourteenth

Amendment and that they were undertaken in retaliation
for Mateo's past grievance filings, in violation of the
First Amendment. Mateo also alleges that O'Connor,
Maclsaac, Purcell, Ward, Royce, Guarino, and Laporto
conspired in this retaliation. With his complaint, Mateo
provided a copy of a grievance filed on August 22, 2008
against O'Connor, Maclsaac, Purcell, Jarvis, Ward, and
Rodriguez (the "Grievance"). Mateo concedes that he
never completed an appeal of the Grievance. (Compl.¶
20.)

On April 15, 2011, defendants moved to dismiss the
complaint in its entirety. (Defs.' Mem. Law Supp. Mot.
Dismiss ("MTD") (Doc. No. 17).) Defendants argue that
the Eleventh Amendment bars Mateo's claims against
DOCS, (*id.* at 4 6), and that Mateo failed to: exhaust his
administrative remedies before bringing suit, (*id.* at 68);
allege the personal involvement of each defendant (*id.* at
9 14); state claims for retaliation or conspiracy (*id.* at 14
18), and allege a liberty interest requiring due process (*id.*
at 18 21). On April 26, 2011, Mateo filed an affirmation
in opposition to the motion, seeking in part to excuse his
failure to exhaust his administrative remedies. (Doc. No.
25.) On June 17, 2011, defendants entered a reply. (Doc.
No. 20.) For the reasons that follow, the Court grants
defendants' motion and dismisses all of Mateo's claims
with prejudice.

### BACKGROUND

The following facts are taken from Mateo's complaint and
are not a finding of fact by the Court. Instead, the Court
assumes these facts to be true for purposes of deciding the
pending motion to dismiss, and construes them in a light
most favorable to plaintiff, the non-moving party.

[1]   In considering a motion to dismiss, the Court accepts
      all well pleaded factual allegations in the complaint
      as true, and draws all reasonable inferences in the
      plaintiff's favor. *See Chambers v. Time Warner, Inc.,*
      *282 F.3d 147, 152 (2d Cir.2002).* The court may
      also consider any documents that are attached to,
      referenced in, or integral to the preparation of the
      pleadings. *See id.* at 152 53.

*\*2* On August 11, 2008, Mateo was moved from
Green Haven's "F Block" housing unit to its "H Block"
housing unit "to be harassed, framed and set-up ... in

Mateo v. O'Connor, Not Reported in F.Supp.2d (2012)

2012 WL 1075830

retaliation for ... numerous written grievances against correction officers at Green Haven." (Compl.¶ 6.)

On the morning of August 21, defendant Corrections Officer MacIsaac, while issuing Mateo a pass to participate in a hearing for an unrelated grievance, "belligerently and menacingly, said ... do not ever write grievances against H BLOCK staffs" or that Mateo would "get fucked up." (*Id.* ¶ 7.) Upon his return to H Block, MacIsaac ordered Mateo to face the wall, defendant Corrections Officer Jarveis stood watch, and non-defendant Corrections Officer J. Vasquez pressed Mateo against the wall and pat-frisked him. (*Id.*) MacIsaac then said in a low tone of voice that "he can fuck me up, knock off my teeth, that it will happen to me right in this place ... for writing grievances." (*Id.*) After a long wait, MacIsaac sent Mateo to his cell, where he discovered that the water and electricity had been cut off. (*Id.* ¶ 8.) Mateo wrote a complaint to the prison superintendent but did not file a grievance. (*Id.*)

On the afternoon of August 21, Mateo returned from the recreation yard to find his clothes on the floor and his possessions tampered with, and MacIsaac, Jarveis and J. Vasquez standing outside his cell laughing. (*Id.* ¶ 9.) MacIsaac then said "that is what happen [sic] when you write grievances" and threatened to beat up Mateo unless he entered his cell. (*Id.*) That evening, Mateo wrote another letter to the superintendent explaining the situation but was denied permission to leave his cell for dinner and went to bed without mailing the letter. (*Id.*)

On the morning of August 22, MacIsaac observed Mateo carrying letters en route to breakfast. (*Id.* ¶ 10.) MacIsaac asked Mateo if the letters were grievances, but Mateo stated they were legal mail. (*Id.*) MacIsaac demanded to see the letters, and Mateo said no. (*Id.*) Defendant Corrections Sergeant O'Connor was then called on the radio. (*Id.*) O'Connor escorted Mateo back to his cell with a large group of officers, again denying him a meal. (*Id.*)

Shortly afterward, an officer informed Mateo that he had been transferred to "G Block." (*Id.* ¶ 11.) While Mateo was carrying his property out of his cell, MacIsaac "was harassing and provoking [Mateo], calling [him] pussy, bitch, and standing [in his] way." (*Id.*) O'Connor and Jarveis were with MacIsaac, who then threw some of Mateo's property down the stairs. (*Id.*) As O'Connor

escorted Mateo to G Block, he told Mateo that he should know better than to write grievances. (*Id.*)

On the evening of August 22, in G Block, Mateo received a "false, fabricated" inmate misbehavior report, charging Mateo with threatening MacIsaac and with causing a flooding and disturbance. (*Id.* ¶ 12.) The misbehavior report was allegedly authored by MacIsaac and signed by MacIsaac, O'Connor, defendant Corrections Officers Purcell and Ward, and defendant maintenance worker Guarino. (*Id.*)

**\*3**  That night, Mateo handed the duty officer the Grievance. (*Id.* ¶ 18.) The Grievance describes the morning incidents of August 22 but without much detail. (*Id.*) It then states that Mateo was issued a "retaliatory misbehavior report" and that he now fears being "hurt by staffs," noting "I fear for my life; I fear to be set up. My property, legal / personal file is not secure ." (*Id.* at 811.) Mateo's Grievance was stamped by Green Haven's Inmate Grievance Program as "received" on August 26, 2008 and annotated "retaliation by block 8/26/08." (*Id.*)

Mateo claims that the Grievance "was coded '49' which indicates Staffs Harassment, which required an expedite process, and to be responded to within 25 days by the Superintendent." (*Id.* ¶ 20 .) The Grievance was ultimately investigated by non-defendant Corrections Captain Burnett and denied by the superintendent, but Mateo complains that the investigation "took over 90 days." (*Id* .) Mateo claims that, at the time, he "had problems understanding the grievance process and its Directive." (*Id.*) Nevertheless, he alleges that as soon as he received the superintendent's response to the Grievance, he "immediately, appealed it to CORC [Central Office Review Committee], which is the last step." (*Id.*) Mateo alleges that he placed his appeal form in the appropriate box outside of the mess hall but that he

> never received a response from CORC, which had 30 days to issue a response or decision, which indicates that it either refused or waived its response or decision or this grievance's appeal seems to have not been processed to CORC, intentionally, to frustrates [sic] the exhaustion of this administrative

remedy, which I assert as the deliberated action of defendants O'Connor and MacIsaac.

(*Id.*) Mateo does not provide a copy of the appeal form, claiming that his copy was removed from his personal property, either when he was moved into Green Haven's Special Housing Unit, or when he was transferred out of Green Haven. (*Id.*)

On September 3, Mateo was found guilty by hearing officer Laporto of the charges in the inmate misbehavior report on the "fabricated evidence and biased testimony of Guarino and O'Connor." (*Id.* ¶ 15.) Mateo claims that he received "a disposition of the maximum penalty, in retaliation." (*Id.*) Mateo was apparently assigned to thirty days in keeplock, with a loss of commissary and phone privileges, from August 22 through September 21, and also a loss of package privileges from September 3 through October 3. (*Id*. at 11.) Mateo appealed the guilty finding on September 9 to defendant Royce, who "arbitrarily and capriciously, affirmed the guilty finding and disposition, in retaliation, in favor of his comrades [sic] officers." (*Id.* ¶ 16.)

Mateo filed harassment and retaliation claims against O'Connor, MacIsaac, and Purcell on August 27, 2008 in the Northern District of New York. (*Mateo v. O'Connor,* No. 08 0923(DNH) (N.D.N.Y.).) Mateo's case was subsequently transferred here, because the complaint's allegations involved incidents at Green Haven, which is in this district. This Court dismissed Mateo's complaint because he filed it within mere days of the incidents of alleged harassment and retaliation, making exhaustion "impossible in so short a time frame ." *Mateo v. O'Connor,* No. 08 Civ. 11053(RJH)(DCF), 2010 WL 3199690, at *3 (S.D.N.Y. Aug. 12, 2010). This Court informed Mateo that his case could be re-filed "with the addition of paragraphs explaining how administrative remedies have been exhausted." *Id.* (citations omitted).

**\*4** On September 21, 2010, Mateo filed the present complaint.

### DISCUSSION

#### A. Standards

### I. Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). However, the Court does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Iqbal,* 129 S.Ct. at 1949.

In the case of a *pro se* litigant, the Court reads the pleadings leniently and construes them "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (citations and internal quotation marks omitted). This guidance applies with particular force when the plaintiff's civil rights are at issue. *See McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004); *see also Flaherty v. Lang,* 199 F.3d 607, 612 (2d Cir.1999). To survive a Rule 12(b) (6) motion to dismiss, a *pro se* plaintiff's factual allegations must, however, be "enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555.

### II. Section 1983

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. *See West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *McKithen v. Brown,* 481 F.3d 89, 99 (2d Cir.2007).

Mere threats, verbal harassment or profanity, without any injury or damage, are not actionable under Section 1983. *Harris v. Keane,* 962 F.Supp. 397, 406 (S.D.N.Y.1997). Likewise, the filing of a false misbehavior report against an inmate does not constitute "a *per se* constitutional violation" actionable under Section 1983, provided the inmate is afforded due process protection via a disciplinary hearing. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, such actions, if taken in

2012 WL 1075830

retaliation against an inmate for pursuing a grievance, may "violate[ ] the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments" and thus become actionable under Section 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996).

To state a *prima facie* retaliation claim for filing a grievance, an inmate must allege that an official took an "adverse action" against him, and that there was a causal relationship between the grievance filing and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). An "adverse action" is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Id.* at 381 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). Actions below this threshold are deemed *de minimis* and outside the ambit of actionable First Amendment retaliation. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001)). Because retaliation claims are easily fabricated, the courts must "examine prisoners' claims of retaliation with skepticism and particular care," *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir., 1995), requiring "detailed fact pleading ... to withstand a motion to dismiss." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

### III. Exhaustion of Administrative Remedies

**\*5** The Prison Litigation Reform Act of 1995 ("PLRA") states in relevant part, "[n]o action shall be brought with respect to prison conditions under [Section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This administrative exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

DOCS maintains a three-tiered administrative review and appeals system for prisoner grievances. *See* N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 7, § 701.5. Prior to pursuing a Section 1983 action in federal court, an inmate in the DOCS system must exhaust all three levels. *See Porter,* 534 U.S. at 524. First, he must file an inmate grievance complaint form or a written grievance with the Inmate Grievance Resolution Committee ("IGRC").

*See* 7 NYCRR § 701.5(a). Second, if he is dissatisfied with the IGRC decision, he may appeal to the prison superintendent. *See id.* § 701.5(c). Finally, an inmate may appeal any superintendent's written denial to the CORC. *See id.* § 701.5(d).

For inmate allegations of harassment or other misconduct by prison employees, DOCS provides an expedited procedure. Such grievances are forwarded directly to the prison superintendent who will determine whether the grievance presents a bona fide harassment issue. *See id.* §§ 701.8(a)(c). The superintendent may request an investigation by the Inspector General's Office and must render a decision within twenty-five calendar days of receiving the grievance. *See id.* §§ 701.8(d)-(f). An inmate may appeal the superintendent's response by filing a notice of decision to appeal to CORC within seven calendar days of receiving the response. *See id.* § 701.8(h). If the superintendent does not render a decision within twenty-five calendar days, the inmate may appeal the grievance to the CORC. *See id.* § 701.8(g).

A final decision by CORC is required in order to exhaust administrative remedies. *Torres v. Carry,* 672 F.Supp.2d 338, 344 (S.D.N.Y.2009). Such a requirement is particularly appropriate for expedited harassment grievances, which, unlike regular grievances, have only one level of administrative review at which to address violative practices and take ameliorative steps to mitigate damages. *See Cruz v. Jordan,* 80 F.Supp.2d 109, 119 120 (S.D.N.Y.1999).

The Court of Appeals has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Id.* at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, the Court should consider whether special circumstances have been plausibly alleged that otherwise justify the prisoner's

2012 WL 1075830

failure to comply with the administrative procedural requirements. *Id.* (citations omitted).

### B. Relief Available

**\*6** As an initial matter, Mateo seeks injunctive relief and monetary damages from the individual defendants. But Mateo cannot obtain injunctive relief from them, because he is no longer incarcerated in Green Haven. An inmate's transfer out of a facility moots any claims he has for injunctive relief against officials of that facility. *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006). Mateo also claims to seek damages from the DOCS and from the other defendants in their official capacities. Such claims are barred by the Eleventh Amendment. *Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002). Accordingly, only Mateo's claims for damages from defendants in their individual capacities are properly before this Court.

### C. Analysis

Defendants argue that all of Mateo's claims are subject to dismissal for failure to exhaust his administrative remedies. (MTD at 6  8.) Because this Court agrees, it need not reach defendants' alternative arguments.

Failure to exhaust "is an affirmative defense under the PLRA, and ... inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Dismissal under Rule 12(b)(6) for non-exhaustion is appropriate only if a plaintiff's failure to exhaust is evident on the face of the complaint. *Id.* at 215. Here, Mateo's complaint includes a copy of the Grievance purportedly supporting his claims and a section of his complaint entitled "Exhaustion of Grievance", which squarely admits his failure to exhaust his remedies with CORC. (*See* Compl. ¶ 20 ("I have never received a response from CORC....").) Accordingly, an exhaustion defense is available with this Rule 12(b)(6) motion.

Retaliation claims "fit[ ] within the category of 'inmate suits about prison life,' and therefore must be preceded by the exhaustion of state administrative remedies available." *Lawrence v. Goord,* 304 F.3d 198, 200 (2d Cir.2002). Likewise, the policies and procedures of a prison's disciplinary and grievance programs may themselves be the subject of a grievance. *Taylor v. Artus,* No. 05 Civ. 271, 2007 WL 4555932, at \*7 (N.D.N.Y. Dec. 19, 2007) (citing 7 NYCRR § 701.3(e)(1), (2); N.Y. Dep't Corr.

Serv. Directive No. 4040 at III.E). Thus, all of Mateo's present claims are subject to the PLRA's administrative exhaustion requirement.

Mateo's August 22 Grievance alleges that he was verbally and physically harassed by defendants O'Connor and MacIsaac and that these defendants, together with defendants Purcell, Ward, Guarino, and Jarveis, conspired to submit a false misbehavior report against Mateo, all in retaliation for filing grievances. (*See* Compl. at 8  11.) Because the Grievance included allegations of harassment, it was sent directly to the facility superintendent pursuant to 7 NYCRR § 701.8. (*See* Compl. ¶ 20.) Mateo claims that he appealed the first denial of his Grievance to CORC immediately after it was denied in late November but concedes that he never received an appellate decision on his Grievance from CORC, and that he never otherwise pursued his appeal to its conclusion. (*See id.*) As Mateo failed to obtain a final decision from CORC before bringing suit, these claims are subject to dismissal unless he can show that his failure is justified.

**\*7** Mateo did not identify any grievance directed to his claims of bias at the hearing and appeal. Accordingly, these claims are also subject to dismissal unless Mateo can show that he was justified in failing to grieve them.

Mateo presents four arguments under *Hemphill* to excuse the absence of administrative exhaustion, but none are availing.

First, Mateo argues that "the Inmate Grievance directive is confusing and at the time of the incidents and filing grievances I did not understood [sic] it." (Opp.¶ 11.) However, as this Court has previously recognized, Mateo appealed at least six other grievances to CORC, all filed at the same time as the events in this action. *See Mateo v. O'Connor,* 2010 WL 3199690, at \*3 n. 5 (noting CORC's recognition of grievances filed on August 11, 2008; September 9, 2008; September 15, 2008; September 22; 2008; September 24, 2008; and October 1, 2008). In a separate action before this Court, Mateo has provided proof of exhaustion of three grievances from this time. Complaint Ex. A *Mateo v. Alexander,* No. 10 Civ. 8427(LAP)(DCF), 2012 WL 864805 (S.D.N.Y. Mar. 14, 2012) (grievance filed June 18, 2008, CORC decision rendered November 26, 2008); *id .* Ex. B (grievance filed July 2, 2008, CORC decision rendered August 27, 2008);

*id.* Ex. C (grievance filed August 11, 2008, CORC decision rendered October 1, 2008). Thus, when Mateo allegedly appealed his Grievance to CORC in late November, 2008, (*see* Compl. ¶ 20), he had already received at least two CORC decisions on other grievances and possibly more. Mateo cannot plausibly have reasonably misunderstood, at the end of 2008, the procedures for grieving an issue or for obtaining a response from CORC.

Second, Mateo argues under *Boyd v. Corrections Corp. of America,* 380 F.3d 989 (6th Cir.2004), that the superintendent's untimely response and CORC's alleged failure to reply rendered the grievance procedure "unavailable." (Opp.¶ 11). Defendants deny that CORC received an appeal, (MTD at 8). But even assuming that Mateo filed an appeal and that the superintendent and CORC missed their response deadlines, the Court of Appeals has not adopted the position taken in cases like *Boyd* that a delay in responding to a grievance demonstrates per *se* unavailability. *See Rivera v. Anna M. Kross Center,* No. 10 Civ. 8696, 2012 WL 383941, at *4 (S.D.N.Y. Feb.7, 2012) (citing *Hemphill,* 380 F.3d at 686 n. 6). In any event, Mateo's immediate appeal of the superintendent's reply, his familiarity with the grievance process, and his receipt of other decisions of appeals from CORC all demonstrate that the administrative process was "available" to him throughout this period and that he could reasonably have inquired with CORC as to the status of his appeal of the Grievance.

Third, Mateo argues that his failure to fully grieve his complaints should be excused because he feared reprisal from by MacIsaac and O'Connor. (*See* Compl. ¶ 18 ("I risked my person to write and file grievances ... taking a chance, and risking physical harm from MacIsaac and O'Connor as they threatened...."); Opp. ¶ 8 ("At H Block my first amendment to file grievance and of speech was chilled, temporarily ... The defendants threats of harm against my person and the issued false inmate misbehavior report chilled my speech.").)

**\*8** The threat of retaliation can render grievance procedures "unavailable" if " 'a similarly situated individual of ordinary firmness' " would be so fearful as to believe that such procedures were unavailable. *See Snyder v. Whittier,* 428 Fed. Appx. 89, 91 (2d Cir.2011) (summary order) (quoting *Hemphill,* 380 F.3d at 688). Alternatively, defendants can be estopped from the defense of non-exhaustion if they prevented an inmate from availing

himself of grievance procedures. *Id.* (citing *Hemphill* at 686).

Mateo's argument is again undermined by his continued filing of grievances and lawsuits during and after the period in question. *See id.* at 92 ("[Petitioner's] assertion that he feared retaliation in the first place ... is belied by his testimony that he complained ... within two hours of the assault.... Our conclusion is further underscored by the fact that [petitioner] complained to no less than four other individuals about the attack, between the time he disclosed details of the attack to [the officer], and the time when he finally attempted to file a formal grievance."); *Davis v. Torres,* No. 10 Civ. 00308, 2011 WL 3918098, at *6 (S.D.N.Y. Aug. 29, 2011) ("Where plaintiff alleges that he submitted numerous grievances, he cannot also contend that he was meaningfully deterred from doing so."). Mateo filed his Grievance about the H Block staff on the night of August 22, within 48 hours of the threatening events. Mateo then filed two additional grievances while on keeplock, and at least three more grievances before receiving an initial response to his August 22 Grievance. (Compl.¶ 20.) Mateo even filed federal claims against O'Connor and MacIsaac within days of the incident in the predecessor to this case. Mateo's own behavior thus renders implausible claims that defendants' threats made the grievance process unavailable from September 2008 (when grievances as to the hearing were due) through the end of 2008 (when his appeal to CORC was due) or that he reasonably relied on their threats. *See also Harrison v. Stallone,* No. 06 Civ. 902, 2007 WL 2789473, at *6 (N.D.N.Y. Sept. 24, 2007) ("If every plaintiff bringing a retaliation claim could have the exhaustion requirement excused by alleging a fear of further retaliation, it would create a general exception to exhaustion for retaliation claims").

Finally, Mateo suggests that MacIsaac and O'Connor may have intercepted his grievance appeal after he deposited it, preventing it from reaching CORC (*See* Compl. ¶ 20; Opp. ¶ 9,) This conclusory suggestion is unsupported by any factual allegations and belied by Mateo's complaint insofar as he claims to have deposited his appeal in late November, 2008, but alleges no interactions with MacIsaac or O'Connor after the September 3, 2008 hearing.

In sum, because Mateo clearly availed himself of an available grievance procedure throughout the period

2012 WL 1075830

at issue in this complaint and because no special circumstances have been plausibly alleged that would justify Mateo's failure to exhaust his administrative remedies in that procedure, all of his claims are dismissed.

**\*9** In 2010, this Court dismissed Mateo's claims without prejudice, and with leave to refile them upon a showing of administrative exhaustion. Mateo has failed to do so in the present action, and the time limits for him to file new grievances, or to complete an appeal of his August 22 Grievance with CORC, have long since passed. The Court of Appeals has held that "dismissal with prejudice, when remedies are no longer available, is required 'in the absence of any justification for not pursuing [such] remedies.' " *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (quoting *Berry v. Kerik,* 366 F.3d 85, 87 88 (2d Cir.2004)); *see also Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 239 240 (W.D.N.Y.2010); *Baez v. Kahanowicz,* 469 F.Supp.2d 171, 180 (S.D.N.Y.2007).

## CONCLUSION

Accordingly, because Mateo failed to properly grieve any of the claims in his complaint, defendants' motion to dismiss (Doc. No. 16) is GRANTED, and plaintiff's claims are dismissed with prejudice. The Clerk of the Court is directed to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1075830

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Eleby v. Smith, Not Reported in Fed. Supp. (2017)
2017 WL 986123
Case 9:17-cv-01229-DNH-TWD   Document 24   Filed 07/08/19   Page 43 of 91

2017 WL 986123
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Terrell K. ELEBY, Plaintiff,
v.
G. SMITH and N. Vevone, Defendants.

Civil Action No. 9:15-CV-0281 (TJM/DEP)
|
Signed January 9, 2016
|
Filed 01/09/2017

**Attorneys and Law Firms**

TERRELL K. ELEBY, 86-A-0908, Sing Sing
Correctional Facility, 354 Hunter Street, Ossining, NY
10562, Pro Se.

FOR DEFENDANTS: ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant
Attorney General, The Capitol, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

**\*1** This is a civil rights action brought by *pro se*
plaintiff Terrell Eleby against three individuals employed
by the New York State Department of Corrections and
Community Supervision ("DOCCS"), one of whom has
since been dismissed from the action, pursuant to 42
U.S.C. § 1983. In his complaint, plaintiff alleges that two
of the defendants assaulted him in violation of his Eighth
Amendment rights, and the third defendant violated his
Fourteenth Amendment rights by issuing an allegedly
false misbehavior report against him and confining him in
the special housing unit ("SHU") at the prison facility in
which he was housed.

Currently pending before the court is a motion brought
by the remaining two defendants seeking the entry of
summary judgment in their favor based upon plaintiff's
alleged failure to exhaust available administrative

remedies before filing suit. For the reasons set forth below,
I recommend that the defendants' motion be granted.

I. BACKGROUND

1    In light of the procedural posture of the case, the
following recitation is derived from the record now
before the court, with all inferences drawn and
ambiguities resolved in plaintiff's favor. *Terry v.
Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Plaintiff is a prison inmate currently held in the custody
of the DOCCS. *See, e.g.,* Dkt. No. 29-2 at 13. Although
plaintiff is now confined elsewhere, at the times relevant
to this action he was housed in the Auburn Correctional
Facility ("Auburn") located in Auburn, New York. *Id.* at
18.

In his complaint, plaintiff alleges that on January 14, 2015,
he was waiting in one of Auburn's hospital dormitory
rooms to be escorted to an outside facility for a medical
examination. Dkt. No. 1 at 4; Dkt. No. 29-2 at 54. At
approximately 10:00AM, defendants Smith and Vevone,
both of whom are corrections officers, arrived at plaintiff's
room to escort him on the medical trip. Dkt. No. 1 at
4. While plaintiff was attempting to remove his clothes
for a mandatory strip search, defendant Smith "violently
and physically attacked [him]." *Id.; see also* Dkt. No. 29-2
at 58. According to plaintiff, both defendants Smith and
Vevone "jumped on [his] back," and defendant Smith
punched him repeatedly in the eye, head, neck, back, and
ribs. Dkt. No. 29-2 at 58, 62-63. After approximately five
minutes Sergeant Cudla, who is not a named defendant
in the action, arrived at plaintiff's dorm, physically
intervened, and ordered defendants Smith and Vevone
to cease the assault and leave the room. Dkt. No. 1 at 4-5;
Dkt. No. 29-2 at 58-59, 64. As a result of the alleged
assault, plaintiff suffered various injuries, including a
bloody and swollen eye, swelling and redness to his neck,
and sore ribs. Dkt. No. 1 at 5; Dkt. No. 29-2 at 62-63, 67.

Following the use-of-force incident, defendants Smith and
Vevone issued plaintiff a misbehavior report accusing
him of violating six prison rules. Dkt. No. 22 at 9; Dkt.
No. 29-2 at 72. Following a superintendent's hearing to
address the charges, plaintiff was found guilty on four
of the six counts. Dkt. No. 22 at 13; Dkt. No. 29-2 at
72. As a result of that finding, plaintiff was sentenced
to serve thirty days of disciplinary SHU confinement,
with a corresponding loss of commissary, package, and

Eleby v. Smith, Not Reported in Fed. Supp. (2017)
Case 9:17-cv-01229-DNH-TWD Document 24 Filed 07/08/19 Page 44 of 91
2017 WL 986123

telephone privileges. Dkt. No. 22 at 13; Dkt. No. 29-2 at 73-72.

## II. PROCEDURAL HISTORY

**\*2** Plaintiff commenced this action on or about March 12, 2015, with the filing of a complaint and accompanied by an application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. On May 12, 2015, Senior District Judge Thomas J. McAvoy issued a decision and order granting plaintiff's IFP application and accepting his complaint for filing, with the exception of one cause of action. [2] Dkt. No. 11. In his third cause of action, plaintiff asserted a Fourteenth Amendment claim against defendant Lieutenant Quinn based on the allegation that defendant Quinn "conspire[d] and aided ... in writing a false [misbehavior] report after ascertaining the facts [sic] that [defendants Smith and Vevone] were in the wrong." Dkt. No. 1 at 6. Judge McAvoy dismissed that cause of action for failure to state a cognizable claim pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 11 at 9-12.

[2] Plaintiff's first and second IFP applications were denied as incomplete. Dkt. Nos. 4, 7. Following those denials, plaintiff filed a third IFP motion, on or about April 2, 2015, which was then granted by Judge McAvoy. Dkt. Nos. 9, 11.

Following the close of discovery, defendants Smith and Vevone filed the currently pending motion for summary judgment seeking dismissal of plaintiff's complaint, arguing that plaintiff failed to fully exhaust available administrative remedies before filing this action. Dkt. No. 29-5. Plaintiff has filed a response in opposition to defendants' motion, which is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

A. Legal Standard Governing Summary Judgment
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. Plaintiff's Exhaustion of Administrative Remedies
**\*3** In their motion, defendants contend that plaintiff's complaint is subject to dismissal because plaintiff has failed to exhaust available administrative remedies as required under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), prior to commencing this action. *See generally* Dkt. No. 29-5 at 2.

1. Legal Principles Governing
Exhaustion Under the PLRA

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-01229-DNH-TWD    Document 24    Filed 07/08/19    Page 45 of 91

2017 WL 986123

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, Fed.Appx. , No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." [3] *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

> [3]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

New York affords state prison inmates the opportunity to seek redress of complaints regarding prison conditions through a grievance procedure that is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[4] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts

a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

> [4]     The IGRC is comprised of "two voting inmates, two voting staff members, and a non voting chairperson. 7 N.Y.C.R.R. § 701.4(a).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[5] *Id.* at § 701.5(c)(3)(i), (ii).

> [5]     Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of an appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

**\*4** The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of an appeal. *Id.* at § 701.5(d)(2)(i).

It is worth noting that, as in this case, where an inmate complains of harassment or other misconduct by corrections officers or prison employees, the IGP provides for an expedited review process. 7 N.Y.C.R.R. § 701.8. In particular, the IGP requires inmates "who wish[ ] to file a grievance complaint that alleges employee harassment [to] follow the procedures set forth in [7 N.Y.C.R.R §] 701.5(a)[.]" *Id.* at § 701.8(a). As was noted above, section 701.5(a)(1) provides that, *inter alia*, the inmate shall submit his grievance to the clerk within twenty-one days of the incident of which he complains. *Id.* at § 701.5(a)(1). On the same day the clerk receives a grievance complaining of employee harassment, he must forward it "to the superintendent by the close of business." *Id.* at § 701.8(b).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate must appeal "to the next step." *Id.* at § 701.6(g)(2); *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

superintendent to timely respond to a grievance ... can and must be appealed to the next level ... to complete the grievance process."). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. [6] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

[6] According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive .]" *Williams*, 829 F.3d at 123 n.2.

## 2. Analysis

**\*5** The record now before the court firmly establishes that plaintiff did not exhaust the available administrative remedies in accordance with the PLRA before commencing this action. According to plaintiff, following the alleged assault, he submitted a (1) grievance, [7] (2) letter to the superintendent at Auburn, (3) memorandum to the IGP supervisor at Auburn, and (4) letter to the New York State Inspector General ("IG") complaining of the alleged assault by defendants Smith and Vevone. [8] Dkt. No. 29-2 at 25-26, 39-40, 46-47, 50, 94-99, 104. Plaintiff did not receive any written response to any of his correspondence. Dkt. No. 29-2 at 40-42, 48-49, 51-53. He claims, however, that an officer stationed at Auburn, Sergeant Cudla, conducted an in-person interview of him on January 22, 2015, in connection with the grievance allegedly filed, and the IG's office conducted an investigation that included an interview of plaintiff in or about April 2015. *Id.* at 40-42, 48-49, 51-53. He also contends that he spoke directly to Deputy Robisson, the Deputy of Superintendent for Security at Auburn, regarding the assault. *Id.* at 31-32, 47-48, 100.

[7] Aside from plaintiff's testimony at his deposition, there is no record evidence to support his allegation that he filed a grievance in accordance with the IGP. *See, e.g.*, Dkt. No. 29 3 at 4; Dkt. No. 29 4 at 2.

[8] In or about 2014 the DOCCS Office of Special Investigations assumed the role previously played by the IG, including investigating complaints regarding prison conditions. *See* DOCCS Directive No. 0700, available at http://www.doccs.ny.gov/Directives/0700.pdf.

Notwithstanding the fact that he did not receive a written response to any of his correspondence regarding the alleged assault, plaintiff admittedly neglected to appeal the lack of a response to the next level of the IGP. *Id.* at 48-51. Because the IGP has been interpreted by courts in this circuit as requiring inmates to appeal to the next level when they do not receive a timely response to their grievance, plaintiff should have appealed to the superintendent and/or the CORC when he failed to receive a written response to the grievance he allegedly

Case 9:17-cv-01229-DNH-TWD   Document 24   Filed 07/08/19   Page 47 of 91

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

filed. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."); *Dabney v. Pegano*, 604 Fed.Appx. 1, 4-5 (2d Cir. 2015) (citing section 701.6(g) and concluding that, based on that provision, the plaintiff had "an unimpeded path to the CORC, notwithstanding his claims that the Great Meadow grievance clerk failed to process his complaint and that the Clinton superintendent ignored his appeal"); *Hyliger v. Gebler*, 624 Fed.Appx. 780, 782 (2d Cir. 2015) ("Under the regulations ..., if at any step of the grievance process[ ] an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to appeal to the next step. Thus, when [the plaintiff] did not receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy." (quotation marks, alteration, citation, and footnote omitted)). The record in this case shows, without contradiction, that while plaintiff appealed other grievance denials to the CORC, he did not do so in connection with defendants' alleged assault. Dkt. No. 29-3 at 4. This default constitutes a failure to exhaust available administrative remedies for purposes of the PLRA.

Liberally construing plaintiff's response to defendants' pending motion, he contends that he fully exhausted administrative remedies before commencing this action because his grievance involved allegations of employee harassment, and, consequently, by sending his letter directly to the superintendent he satisfied the requirements of the IGP. Dkt. No. 31 at 5. The IGP, however, clearly mandates that even those grievances complaining of employee harassment must be filed with the IGP clerk, who then must forward the grievance to the superintendent on the day of receipt. 7 N.Y.C.R.R. § 701.8(a). Writing and sending a letter directly to a superintendent does not satisfy the IGP. *See Dabney*, 604 Fed.Appx. at 3 ("The IGP also has an expedited process for harassment grievances, which pertains to employee conduct meant to annoy, intimidate, or harm an inmate. These grievances go directly to a superintendent." (quotation marks, citations omitted)); *see also Lopez v. Bushey*, No. 11-CV-0418, 2014 WL 2807532, at *9 (N.D.N.Y. Apr. 7, 2014) (Dancks, M.J.) ("If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives a code of 49.... [T]he grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility.").

**\*6** Plaintiff next argues that he appealed the disciplinary hearing determination related to the misbehavior report he was issued, following the alleged assault by defendants Smith and Vevone, on January 14, 2015. Dkt. No. 31 at 3. Appealing a disciplinary hearing determination, however, is no substitute for filing and pursuing to completion a grievance through the IGP. [9] *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 256 (S.D.N.Y. 2003).

[9]     In any event, plaintiff's appeal of the disciplinary hearing determination does not complain of excessive force used by defendants Smith and Vevone. Dkt. No. 22 at 22 23. Instead, plaintiff argued on appeal that the hearing determination was based on insufficient evidence. *Id.* Accordingly, even assuming the appeal from the disciplinary hearing could act as a substitute for filing and pursuing a grievance through the IGP, plaintiff's appeal did not place prison officials on notice of his complaints of excessive force because he did not raise them in his appeal. *Id.*

Plaintiff also "asserts ... that the defendants hinder[ed] [his] complaint from reaching the CORC and from being properly filed with the IGRC." Dkt. No. 31 at 5. While I am mindful of my obligation to draw all inferences in favor of the non-moving party on summary judgment, *Terry*, 336 F.3d at 137, this conclusory allegation is not supported by any record evidence. Indeed, plaintiff sets forth this contention in an unsworn memorandum of law, which is decidedly not evidence. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 142 (2d Cir. 2003) ("In support of the assertion that the police had received complaints of drug activity in the area, the district court cited, not to admissible evidence, but to the defendants' memorandum of law, which is not evidence at all."). In any event, even assuming plaintiff's contention constitutes competent evidence, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996). At his deposition in this matter, plaintiff unequivocally testified that he did not file an appeal of his grievance to the CORC. Dkt. No. 29-2 at 49-51. He now attempts to create a dispute of fact by arguing that defendants thwarted his appeal from reaching the CORC. Dkt. No. 31 at 5. This he cannot do. *Hayes*, 84 F.3d at 619.

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

Finally, to the extent plaintiff contends that his letter to the IG and any subsequent investigation constitutes exhaustion under the PLRA, plaintiff is incorrect. *See, e.g., Goodson v. Silver*, No. 09-CV-0494, 2012 WL 4449937, at *9 (N.D.N.Y. Sept. 25, 2012) (Suddaby, C.J.) ("[A]n IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement[.]" (citing cases)).

In summary, because plaintiff admittedly failed to pursue a grievance filed under the IGP to completion by filing an appeal to the CORC, and because he has failed to set forth any evidence that the IGP was rendered unavailable to him, I recommend that defendants' motion be granted.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's remaining cause of action alleges that defendants Smith and Vevone applied excessive force against him on January 14, 2015. Although plaintiff alleges that he filed various written documents  including a grievance in accordance with the IGP  complaining of defendants' use of force, he admits that he did not pursue the matter through the IGP by seeking review of his grievance by the CORC, as required under the available grievance program. Accordingly, it is respectfully

**\*7** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 29) be GRANTED and that plaintiff's complaint in this matter be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [10] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

[10]     If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 986123

---

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan MENA, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts

1    The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2 3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (*See* Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-hour period that he was held in the cell. (*See id.* at 4.) Consequently, he asked Defendant, who was on duty, to transfer him to a different cell. (56.1 Stmt. ¶¶ 7 8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (*Id.* ¶ 9; *see also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (*See* Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11 12; *see also* Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and

Case 9:17-cv-01229-DNH-TWD    Document 24    Filed 07/08/19    Page 50 of 91

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7, 8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled

to qualified immunity. (Doc. Nos. 53, 55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

### II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of

Case 9:17-cv-01229-DNH-TWD    Document 24    Filed 07/08/19    Page 51 of 91

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]' that is, point[s] out ... that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at \*3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at \*1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

## III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with

the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at \*3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at \*6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days[,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at \*7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at \*8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12 14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7 8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7 8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question,"

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

Case 9:17-cv-01229-DNH-TWD    Document 24    Filed 07/08/19    Page 52 of 91

2016 WL 3948100

but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, F.3d. , , 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858 59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier

'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged let alone shown that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D) (9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that

Case 9:17-cv-01229-DNH-TWD    Document 24    Filed 07/08/19    Page 53 of 91

Mena v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 3948100

the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g., Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

[2]    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff s failure to exhaust remedies.

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3948100

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1397006
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Andre CANTEY, Plaintiff,
v.
Daniel F. MARTUSCELLO, et al., Defendants.

9:17-CV-0284 (LEK/CFH)
|
Signed 03/28/2019

**Attorneys and Law Firms**

Andre Cantey, Wallkill, NY, pro se.

John F. Moore, Office of Attorney General  Albany State of New York, Albany, NY, for Defendants.

## MEMORANDUM-DECISION AND ORDER

Lawrence E. Kahn, U.S. District Judge

## I. INTRODUCTION

 **\*1**  Pro se Plaintiff Andre Cantey is a member of the Nation of Islam ("NOI") in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"). He and other NOI adherents, like many other followers of Islam, have a religious obligation to participate

> in the weekly congregate religious observance known as Jumu'ah. Participation in Jumu'ah is the central observance of Islam. It is commanded by the Qur'an (the principal book of the Muslim religion), see Qur'an 62:9-10, must be held on Friday afternoon and must be performed congregationally rather than individually. Jumu'ah has been compared in importance 'to the Saturday service of the Jewish faith and the Sunday service of the various Christian sects.'

Salahuddin v. Coughlin, 993 F.2d 306, 307 (2d Cir. 1993) (quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 360 (1987)); Dkt. No. 42-1 ("Quran") at 2 3; Dkt. No. 1 ("Complaint") ¶¶ 1 2.  The NOI also observes a twice-yearly holy day called "Savior's Day," which commemorates the anniversary of the births of two of the sect's founders, Wallace Fard Muhammad and

Elijah Muhammad. Dkt. No. 33-3 ("DOCCS Religious Calendar") at 48.

[1]    Plaintiff s statements in the Complaint, as well as his Opposition (Dkt. No. 36), are testimony cognizable on summary judgment, as they are sworn under penalty of perjury. Compl. ¶ 17.

Plaintiff alleges that while he was incarcerated at Coxsackie Correctional Facility, Superintendent Daniel Martuscello, Chaplain Grover Reddie, and Deputy Superintendent of Programs David Barringer denied him the opportunity to participate in Jumu'ah, Savior's Day, and other religious exercises. Compl. at 5 13. The Court previously screened Plaintiff's Complaint under 18 U.S.C. § 1915 and found that it stated claims (1) against Reddie for violating Plaintiff's rights under the Free Exercise Clause of the First Amendment; and (2) against Martuscello and Barringer for religious discrimination under the Equal Protection Clause of the Fourteenth Amendment. Dkt. No. 5 ("May 2017 Order") at 14. After the parties exchanged discovery, Defendants moved for summary judgment based on the doctrine of qualified immunity, Dkt. No. 33 ("Motion for Summary Judgment"), and Plaintiff opposed, Dkt. No. 36 ("Opposition"). The Honorable Andrew Christian F. Hummel, United States Magistrate Judge, issued a report-recommendation concluding that the Motion for Summary Judgment should be granted. Dkt. No. 39 ("Report-Recommendation"). Plaintiff objects. Dkt. 42 ("Objection"). [2]

[2]    On January 24, 2019, the Court issued a text order requesting further briefing from both parties on certain issues. Dkt. Nos. 43 ("January Text Order  ), 51 ("Defendants' Supplemental Memorandum  ), 53 ("Plaintiff s Supplemental Memorandum  ).

The Court agrees with the Magistrate Judge that a reasonable jury could not find Martuscello or Barringer liable for violating the Fourteenth Amendment. However, there is evidence to suggest that Reddie ignored Plaintiff's and other NOI adherents' requests to hold Friday Jumu'ah services for NOI inmates, that he postponed the NOI's Savior's Day religious event, and that a reasonable official in his position would have recognized those actions were unconstitutional. Accordingly, the Court denies the Motion for Summary Judgment with respect to Plaintiff's free exercise claim against Reddie but grants the motion with respect to the claims against Martuscello

and Barringer. It also orders Reddie to report whether he objects to the Court deeming the Complaint to assert a claim against him under RLUIPA. It reasons as follows.

## II. LEGAL STANDARD

### A. Reviewing a Report-Recommendation

**\*2** Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to" and it "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636. However, "where [the] parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision." Mario v. P & C Food Markets, Inc., 313 F.3d 758, 766 (2d Cir. 2002); see also Thomas v. Arn, 474 U.S. 140, 150 (1985) (holding that Congress did not "intend[ ] to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings").

### B. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute over a material fact is "genuine" if there is enough evidence to permit a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, summary judgment should be granted if and only if "no reasonable trier of fact could find in favor of the nonmoving party." Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

Defendants bear the burden of identifying those portions of the record that demonstrate that Plaintiff (who bears the burden of proof at trial) has failed "to establish the existence of an element essential to [his] case." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To rebut

Defendants' showing, Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). He may not rest upon the mere allegations or denials of his pleading, but must set forth "specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248. And he must support those facts with citations to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

That said, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the plaintiff. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Its duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

### C. Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To establish this defense at the summary judgment stage, the officers must show, based on undisputed facts, "*either* that [their] conduct did not violate 'clearly established rights' of which a reasonable person would have known, or that it was 'objectively reasonable' [for them] to believe that [their] acts did not violate these clearly established rights." Soares v. State of Conn., 8 F.3d 917, 920 (2d Cir. 1993).

**\*3** The Court must look to both "the clarity of the law establishing the right allegedly violated' as well as 'whether a reasonable person, acting under the circumstances confronting a defendant, would have understood' that his actions were unlawful." Hanrahan v. Doling, 331 F.3d 93, 98 (2d Cir. 2003) (quoting Vega v. Miller, 273 F.3d 460, 466 (2d Cir. 2001)). The "contours" of the right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Golodner v. Berliner, 770 F.3d 196, 205 (2d Cir. 2014) (quoting Anderson v. Creighton, 483 U.S. 635, 639 40

(1987)). Thus, "once [the court] identif[ies] the right at issue," it must "look to whether the Supreme Court or [the Second Circuit] had articulated that right with adequate specificity at the time" of the alleged violation. Id. "[T]he right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." Reichle v. Howards, 566 U.S. 658, 665 (2012) (citations and quotation marks omitted). This standard "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. Al-Kidd, 563 U.S. 731, 741 (2011).

### III. FACTUAL BACKGROUND

The Report-Recommendation contains a more detailed summary of the evidence. R. & R. at 2 14. In short, the parties agree (or do not dispute) that the Coxsackie Religious Calendar did not list Jumu'ah as a scheduled service for NOI inmates, and that NOI inmates were not given the opportunity to participate in Jumu'ah services from at least June through December 2015. Dkt. No. 33-6 ("Defendants' Statement of Facts") ¶¶ 51, 58, 62; Opp'n at 16, ¶¶ 51, 58, 62. Dkt. No. 33-4 ("Coxsackie Religious Calendar") at 17. This period included Ramadan, which lasted from June 18 through July 17, 2015. Defs' SOF ¶ 42. According to Plaintiff, Reddie and Barringer ignored requests, made in June 2015 by Plaintiff and other NOI inmates, to allow them to participate in such services. Compl. ¶ 2; Opp'n ¶ 10 (citing Hill Letter, filed in Dkt. No. 42-1 at 25 30). Both defendants deny they received any such request. Defs' SOF ¶ 44. The parties agree that Jumu'ah services were scheduled to be held on Friday mornings beginning on January 8, 2016. Defs' SOF ¶¶ 58, 60, 62; Opp'n at 16 ¶¶ 58, 60, 62.

The parties also agree that Savior's Day was on October 7, 2015, and that religious observances were scheduled for that day on the 2015 Coxsackie Special Events Calendar. Compl. ¶ 4; Defs' SOF ¶ 16. On October 6, 2015, however, Reddie informed the NOI community that the Savior's Day event needed to be rescheduled to make room for other events being held that day. Id. ¶¶ 17 19. Defendants assert that the event was postponed and held on October 24, 2015, id. ¶ 26, while Plaintiff alleges that it was cancelled entirely, Opp'n ¶ 24.

Plaintiff also asserts that when Coxsackie finally held Jumu'ah services for NOI inmates, prison officials released

them from their cells too late to complete religious services; denied them the right to shower before Jumu'ah; frequently cancelled the Islamic study classes normally held on Tuesdays for NOI inmates; and forced them to break their religiously-mandated fast before sunset on Savior's Day in February 2016. Comp. ¶¶ 12 18; Opp'n at 16 21, ¶¶ 65 110; R. & R. at 2 4. Defendants deny that these events violated the Constitution or, to the extent they admit that the late call-outs, shower-denials, cancellations, and premature fast-breaking occurred, deny that they were personally involved in them. R. & R. at 9 14; Defs' SOF ¶¶ 65 110.

### IV. DISCUSSION

A reasonable jury could find that denying Plaintiff the opportunity to participate in Jumu'ah services for five months and postponing Saviors Day services in October 2015 put a "substantial burden" on Plaintiff's religious exercise, and that prison officials had no legitimate reason for doing so. The Court concludes that such conduct would have violated Plaintiff's clearly established rights under the Free Exercise Clause. Second, a reasonable jury could find that Reddie intentionally participated in those denials despite having information that would have alerted a reasonable officer he was violating those rights.

**\*4** However, a rational jury could not find Reddie liable based on the cancellations of Islamic study classes, denying Plaintiff showers before Jumu'ah services, or cutting short his participation in Jumu'ah services or his February 16 Savior's Day fast. Nor could it find that Martuscello or Barringer violated Plaintiff's rights.

The Court will address each point in turn.

### A. Denial of Jumu'ah and October 2015 Savior's Day Services

As the Magistrate Judge explained, "[i]nmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." O'Lone, 482 U.S. at 348 (citations omitted). That directive subjects government actions to heightened scrutiny when they place "substantial burdens" on practices motivated by beliefs that are "sincerely held, and in the individual's own scheme of things, religious." Ford v. McGinnis, 352 F.3d 582, 588, 592 (2d Cir. 2003). "[A] substantial burden exists where the state 'put[s] substantial pressure on an adherent to modify

his behavior and to violate his beliefs.' " Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996) (quoting Thomas v. Review Bd. of Ind. Emp. Sec. Div., 450 U.S. 707, 718 (1981)).[3] Government regulation "exceeds the substantial burden threshold" when it "significantly inhibit[s] or constrain[s] conduct or expression that manifests some central tenet of a prisoner's individual beliefs" or "den[ies] a prisoner reasonable opportunities to engage in those activities that are fundamental to a prisoner's religion." Muhammad v. N.Y. Dep't of Corr., 904 F. Supp. 161, 188 (S.D.N.Y. 1995).

[3]  The Second Circuit Court of Appeals has not decided whether a burden on religious practices must be "substantial in order to violate the First Amendment. Williams v. Does, 639 F. App'x 55, 56 (2d Cir. 2016) (citing Holland v. Goord, 758 F.3d 215, 220 (2d Cir. 2014)). It is also unclear whether the "substantial burden test, to the extent that it lives, "includes an inquiry into the centrality or importance of a burdened practice to the plaintiff s system of religious belief. Salahuddin, 467 F.3d at 275 n.5. At times, the Second Circuit has stated that when "determining whether a prisoner s religious beliefs have been substantially burdened, the relevant question is whether the infringed upon religious activity is considered central or important to the prisoner s practice of his religion. Williams, 639 F. App'x at 57; see also Newdow v. Peterson, 753 F.3d 105, 109 (2d Cir. 2014) (applying the "substantial burden test to hold that inscription "In God We Trust on U.S. currency did not compel atheists to choose between "a basic benefit and a core belief ). On other occasions, however, it has warned district courts not to "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds. McEachin v. McGuinnis, 357 F.3d 197, 201 (2d Cir. 2004); accord Korte v. Sebelius, 735 F.3d 654, 683 (7th Cir. 2013) (opining that the "substantial burden test "evaluates the coercive effect of the governmental pressure on the adherent s religious practice and steers well clear of deciding religious questions ). The Court need not resolve these issues both because the parties have not raised them and because Reddie s conduct imposed a substantial burden on Plaintiff s religious exercise under either analysis.

**\*5**  However,

[b]alanced against the constitutional protections afforded prison inmates, including the right to free

exercise of religion ... are the interests of prison officials charged with complex duties arising from administration of the penal system. Free exercise claims of prisoners are therefore 'judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.'

Ford, 352 F.3d at 588 (quoting O'Lone, 482 U.S. at 349) (some quotation marks and citations omitted). Prison officials may interfere with inmates' exercise of their religion if their actions are "reasonably related to legitimate penological interests" such as "deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone, 482 U.S. at 348 (citing Turner v. Safely, 482 U.S. 78, 89 (1987)).[4]

[4]  The Second Circuit has not decided "what effect the Supreme Court's decision in Emp. Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 879 (1990) holding that the Free Exercise Clause does not mandate religious exemptions from neutral laws of general applicability], has on the O'Lone standards for judging prisoner free exercise claims. Salahuddin, 467 F.3d at 274 n.3 (citing Levitan v. Ashcroft, 281 F.3d 1313, 1318 19 (D.C. Cir. 2002) (exploring the possible implications of Smith)); see also Holland, 758 F.3d at 222 (instructing district court to apply the Turner/O'Lone reasonableness test to a generally applicable regulation). Neither party asks the Court to do so in this case.

The Second Circuit applies the same balancing test to generally-applicable policies and case-specific decisions. Ford, 352 F.3d at 595 n. 15. "First, there must be a valid and rational connection between the regulation and the legitimate government interest justifying it." Id. at 595. Next, the Court must consider

whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

Salahuddin v. Goord, 467 F.3d 263, 274 (2d Cir. 2006).

To defeat summary judgment on a free exercise claim, the prisoner has the initial burden to show that "the disputed conduct substantially burdens his sincerely held religious beliefs." Id. (citing Ford, 352 F.3d at 591) (assuming without deciding that the burden must be "substantial"). Second, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." Id. Then, the "prisoner [must] 'show that these [articulated] concerns were irrational.' " Id. (citing Fromer v. Scully, 874 F.2d 69, 74 (2d Cir. 1989)).

Defendants do not question that Plaintiff's religious beliefs are sincerely held. Accordingly, to determine if Plaintiff's clearly established rights free exercise were violated, the Court must decide only whether the denials of religious services placed substantial and unjustified burdens on the exercise of those beliefs, and if so, whether reasonable officers in Defendants' positions would have known it.

### 1. "Substantial Burden"

#### i. Jumu'ah

**\*6** Evidence of which a reasonable chaplain would have known suggests that denying Plaintiff access to Jumu'ah services placed a substantial burden on his religious exercise.

Twenty-six years ago, the Second Circuit deemed it "well established that prisoners have a constitutional right to participate in congregate religious services." Salahuddin, 993 F.2d at 308. "[M]issing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion." Jones v. Malin, No. 15-CV-5381, 2017 WL 985943, at *3 (S.D.N.Y. Mar. 13, 2017). But "[d]enying an inmate congregate religious services over a prolonged period [does] substantially burden[ ]" that right." Id. In Young v. Coughlin, the Second Circuit held that preventing a prisoner from attending Jumu'ah services, religious classes, and Ramadan activities for two months without a legitimate reason was sufficient to support a free exercise claim passed summary judgment. 866 F.2d at

570. And in Ford, the Second Circuit held that a prison chaplain (an Imam) who refused a prisoner's request to attend just one holiday service  the Eid ul Fitr feast at end of Ramadan  imposed substantial burden without any legitimate justification and, therefore, violated the inmate's clearly established rights. 352 F.3d at 594, 597; see also Salahuddin, 467 F.3d at 277 (holding that where "the facts, viewed in the light most favorable to [the plaintiff-prisoner], show[ed] a violation of his free-exercise rights by exclusion from [Muslim] religious services and denial of in-cell religious meals for no permissible reason" for around two months, defendant-official could not have "reasonably perceived" such the infringement to be constitutional). [5]

[5]  These cases did not contradict O'Lone, decided in 1987. There  where the Supreme Court upheld a prison regulation restricting prisoners assigned to outdoor work details from reentering the prison to attend Jumu'ah  the Court assumed that the regulation imposed a substantial burden on their religious exercise, but found based on prison officials' testimony that legitimate security concerns justified the regulation. O'Lone, 482 U.S. at 350 51. It considered the prisoners' ability "to participate in other religious observances of their faith  only to "support  ] the conclusion that the restrictions at issue ... were reasonable. Id. As explained later, unlike in O'Lone, Defendants have not offered any legitimate penological reason for denying Plaintiff s requests for Jumu'ah services.

As in Young, Ford, and Salahuddin, there is ample evidence (of which Reddie should have known) that attending Jumu'ah services on Fridays, particularly during Ramadan, was for Plaintiff critical to observing his religion. In a letter addressed to defendants Barringer and Reddie, as well as Deputy Commission of Programs Jeff McCoy, Anthony Hill (the NOI inmate facilitator at Coxsackie) stated that:

> The NOI community w[ould] like to observe a religious worship service and congregational prayer of Ju'mah Friday as the whole Islamic world is observing. The whole entire Islamic world of orthodox Muslims and NOI Muslims are practicing their Islamic worship

through their belief and guidance of the Holy Quran. Ju'mah Friday is a ritual tradition and practice by "ALL" Muslims worldwide. Congregational prayer on Fridays is a very important part of the spiritual growth and development of the NOI.

**\*7** Dkt. No. 42-1 ("Hill Letter") at 27.[6] Hill also explained that he had already expressed these concerns to Reddie. Id. at 25; see also Quran 2 3 (stating under the heading "Surat Al-Jumu'ah" that "[w]hen the call is proclaimed for the Salat (prayer) on Friday (Jumu'ah prayer), come to the remembrance of Allah ... and leave off business (and every other thing)).

[6]   Plaintiff referred to Hill s letter to his Opposition, Opp'n at 3, and attached it to his Objection as part of Exhibit C, and the Court directed Defendants to address the letter in their Supplemental Memoranda. Though Defendants assert that Reddie never received the letter itself, they have raised no other objections to the Court considering Hill s statements within it for the purposes of summary judgment. See Defs' Supp. Mem. at 4 9. Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible at trial. ). The Court has done so. However, at trial, to prove the truth of any of the assertions in the letter, Plaintiff would need to offer admissible evidence of it   for example, the testimony of Hill as a witness.

DOCCS literature confirmed these descriptions. The DOCCS 2015 Religious Holy Day Calendar noted that "Nation of Islam offenders observe Friday as a day of worship" and that "Nation of Islam holy days," including Ramadan, are celebrated in a like manner to the rest of the Muslim community." DOCCS Religious Calendar at 48; see also id. at 32 (stating that during "Friday Jumu'ah service ... Muslims are required to offer their prayers upon the early entry of the time of prayer"). A 2013 calendar prepared by defendant Reddie listed Jumu'ah services on Friday afternoons for "Muslim[s]," though events specific to the Nation of Islam were listed under a separate heading. Coxsackie Religious Calendar at 17. Sure enough, Plaintiff testified that he "has been to two other state facilities in DOCCS and both facilities

Wyoming and Downstate   provide religious Jumu'ah Services on Friday afternoon for the NOI faith." Opp'n at 13, ¶ 41.

Drawing all inferences from this evidence in Plaintiff's favor, a reasonable officer in Reddie's position would have known that missing Jumu'ah services from June 23, 2015, when Plaintiff wrote defendant Reddie, until January 2016 would impose a substantial burden on his religious exercise.

*ii. Savior's Day*

The Magistrate Judge found it beyond genuine dispute that the decision to cancel the October 7, 2015 Savior's Day service (or reschedule it for October 24, 2015) did not place a substantial burden on Plaintiff's religious exercise. The Court respectfully disagrees.

As discussed earlier, government action "substantially burdens" a prisoner's religious exercise when it prevents him from doing something that it "central or important to the prisoner's practice of his religion." Williams, 639 F. App'x at 57. The Magistrate Judge correctly observed that "courts within the Second Circuit have consistently held that missing two religious services does not pose a substantial burden on an inmate's religious exercise." R. & R. at 24. However, the cases cited in the Report-Recommendation addressed only weekly worship services. Id. at 23 24.

In contrast, the DOCCS religious calendar lists "Savior's Day" on October 7, 2015 as a "holy day" of special significance in the NOI faith: the "anniversary of the birth of the Most Honorable Elijah Muhammad." DOCCS Religious Calendar at 48. DOCCS policy "afford[s] offenders the opportunity to have an in-house program during the day." Id. The event is recognized as significant enough that it may only be rescheduled to occur after Savior's Day with prior approval from the Director of Ministerial, Family, and Volunteer Services, which Defendants concede was not obtained in this case. Defs' SOF ¶¶ 33 (citing DOCSS Directive 4202 § VII(A)), 40. Plaintiff testified that Savior's Day is indeed a "holy day" that NOI adherents cannot "make up" by observing on another day, and that the two NOI inmate facilitators agreed with him. Opp'n at 11, ¶¶ 20, 27.

**\*8** As indicated earlier, the Second Circuit has held that denying an inmate the opportunity to attend one service that is "central or important" to his religion, such as a holy day observance, without a legitimate reason violates his clearly established First Amendment rights. Ford, 352 F.3d at 594, 597. In Ford, the Muslim chaplain denied the plaintiff the opportunity to participate in the Eid ul Fitr feast at the end of Ramadan because the plaintiff was confined in the Special Housing Unit ("SHU"), "a more restrictive confinement reserved for prisoners who present disciplinary or other problems." Id. at 585. The Court denied summary judgment and stated that if it had been undisputed that the plaintiff had not received the feast on Eid ul Fitr, it "would [have been] inclined to hold ... that [he] ha[d] established a substantial burden as a matter of law." Id. Relying on the plaintiff's testimony and the "DOCCS religious calendar [which] recognize[d] the Eid ul Fitr as one of the [Muslim] faith's important celebrations and ma[de] specific reference to the feast." Id. at 594. Therefore, Eid ul Fitr was "sufficiently unique in its importance within Islam to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisoner's religious dietary restrictions was found to be a de minimis burden." Id. n.12; accord Shakur v. Selsky, 391 F.3d 106, 120 (2d Cir. 2004) (holding that denying a Muslim prisoner from participating in religious feast placed a "substantial burden" on his religious exercise).

Defendants point out that other NOI inmates agreed to have the Saviour's Day event rescheduled. Reddie Decl. ¶ 4. However, the fact that other NOI members felt comfortable postponing Savior's Day observance does not answer the "relevant question:" whether holding the event on Savior's Day was "central or important to Ford's practice of Islam." Ford, 352 F.3d at 594. In Ford, the defendants argued that they were entitled to qualified immunity because they reasonably relied on Imams' advice that the holy day observance was unimportant, and that the officials could prevent a Muslim from attending without substantially burdening his beliefs. Id. at 597 98. The court of appeals rejected that argument. Id. at 598. "Despite the fact that all the religious authorities testified to their belief that he [event] was without religious significance, the proper inquiry was always whether Ford's belief was sincerely held and 'in his own scheme of things, religious.' " Id. at 598. Therefore, "[t]he religious authorities' opinions that a particular practice [was] not religiously mandated under Muslim

law, without more, [did not] render [the] defendants' conduct reasonable." Id. Likewise, given the importance Plaintiff and DOCCS policy attributed to holding Savior's Day services on Savior's Day, a reasonable official in Reddie's shoes would not necessarily have believed that the "practice [was] so peripheral to the plaintiff's religion" that postponing the event could "be aptly characterized as [a] constitutionally de minimis" burden. Id. at 593. [7]

[7]     The fact the Ford and Shakur addressed a different holy day (Eid ul Fitr, rather than Savior s Day), does not change the analysis. See Ford, 352 F.3d at 597 (explaining that "courts need not have ruled in favor of a prisoner under precisely the same factual circumstance in order for the right to be clearly established ).

### 2. Legitimate Penological Interests

Defendants have not presented any evidence that they had a legitimate penological reason not to hold weekly Jumu'ah services from June through December 2015 or to postpone the October 2015 Savior's day event. They do assert that "there was a lack of space at the facility for all of the events scheduled at Coxsackie C.F. on October 7, 2015 due to a large number of events which were scheduled for that date." Defs' SOF ¶ 18. But nothing in the record identifies these "events" or explains why holding them instead of Savior's Day services (which had been on the DOCCS religious calendar for a year) served to deter crime, rehabilitate prisoners, protect institutional security, or meet any other penological goal. O'Lone, 482 U.S. at 348.

"The Second Circuit has held that qualified immunity is not appropriate at the summary judgment stage where genuine issues of material fact exist as to whether defendants had legitimate penological justifications for denying plaintiffs certain opportunities for religious exercise." Pugh v. Goord, 571 F. Supp. 2d 477, 512 (S.D.N.Y. 2008); see Orafin v. Rashid, 249 F. App'x 217, 218 (2d Cir. Sept. 28, 2007) (reversing grant of summary judgment and denying qualified immunity based on "unresolved issues of material fact relevant to the questions of (1) the burden that the denial of a Friday congregate prayer service placed on plaintiffs' religious exercise; and (2) whether the DOC is able to accommodate plaintiffs' request for a Shiite-led Friday congregate prayer service without jeopardizing legitimate

penological objectives."); Salahuddin, 467 F.3d at 275 77 (reversing grant of summary judgment and denying qualified immunity because prison officials did not meet their "burden ... to 'point[ ] to [something] in the record suggesting" that the officials denied religious services because of the legitimate interest of preventing threats to inmate safety); Young, 866 F.2d at 570 (holding that the district court should have denied summary judgment because prison officials did not "proffer an explanation as to why [the inmate] was denied access to religious services, or articulate a particular penological interest that was served by denying appellant such access"). Therefore, Reddie is not entitled to summary judgment based on qualified immunity.

### 3. Reddie's Personal Involvement

**\*9** It is not enough, however, to show that Plaintiff's clearly established rights were violated. Under § 1983, a "plaintiff must [also] show ... the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013). Reddie argued, and the Magistrate Judge concluded, that he was not personally involved in denying Jumu'ah services or postponing Savior's Day. In the Court's view, however, a reasonable jury could reach the opposite conclusion and find that a reasonable officer in Reddie's position would have known that his acts and omissions would violate Plaintiff's right to exercise his religion.

"Government officials may be held liable under § 1983 for a failure to do what is required as well as for overt activity which is unlawful and harmful." Doe v. N.Y.C. Dep't of Soc. Servs., 649 F.2d 134, 141 (2d Cir. 1981). "When an official is charged with default in exercise of the above affirmative responsibility, there are two fundamental requisites for § 1983 liability to be imposed:" (1) "the omissions must have been a substantial factor leading to the denial" of constitutional rights; and (2) the officials "must have displayed a mental state of at least "deliberate indifference" in order to "meaningfully be termed culpable" under § 1983. Id. In other words, "[t]o find a defendant liable in a § 1983 action, the defendant must be the proximate cause of the constitutional violation alleged," Burton v. Lynch, 664 F. Supp. 2d 349, 361 n.17 (2009), and must have the mental state required to violate the Constitutional provision at

issue, Turkman v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015), rev'd on other grounds, Ziglar v. Abbasi, 137 S. Ct. 1843 (2017).

The Second Circuit's decisions have made it clear that a state official "prohibit[s]" religious exercise under the First Amendment if he intends to place a burden on the plaintiff's religious exercise. The Second Circuit has repeatedly found triable claims against prison officials (in at least one case, a chaplain) who knowingly refused to allow Muslim prisoners to participate in religious services without any discriminatory motive. See Salahuddin, 467 F.3d at 275 (denying access to holiday services and religious meals); Ford, 352 F.3d at 585, 594 (denying request to attend Eid ul Fitr); Young, 866 F.2d at 570 (denying access to Jumu'ah services); see also McEachin, 357 F.3d at 119, 202 04 (noting that "courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith" violates the constitution "even when the infringement results from the imposition of legitimate disciplinary measures"); By taking an action, or refusing to act, knowing that it would burden prisoners' religious exercise rights, the defendants in these cases can be said to have intended that result in the traditional tort-law sense. See W. Page Keeton et al., Prosser & Keeton on Torts § 8 ("Prosser") (defining "intent" as "the purpose to bring about state physical consequences" or the "substantial certainty" those consequences will flow from one's actions and distinguishing it from "motive," or the "reasons for desiring certain consequences"); accord Restatement (Second) of Torts § 8A (1965) ("Second Restatement"); see also Manuel v. City of Joliet, Ill., 137 S. Ct. 911, 920 (2017) (explaining that "[t]raditional tort principles," along with "the values and principles of the constitutional right at issue," help define "the contours and prerequisites of a § 1983 claim.").

"To be 'intentional,' an invasion of another's interest ... need not be inspired by malice or ill will on the actor's part toward the other. An invasion so inspired is intentional, but so is an invasion that the actor knowingly causes in the pursuit of a laudable enterprise without any desire to cause harm." Second Restatement § 825. As the court implicitly held in Ford (where the chaplain simply denied the plaintiff's request to attend services), omissions may also be intentional. See id. ("It is the knowledge that the actor has at the time he acts or fails to act that determines whether the invasion resulting from his

conduct is intentional or unintentional."). After all, an inmate is locked in a cell many hours of the day; inmates must rely on "call-outs"—scheduled times for release—to attend religious services. Defs' SOF ¶ 101. As with medical care, "if the prison authorities fail to [act]," the inmate's religious "needs will not be met." Estelle v. Gamble, 429 U.S. 97, 103 (1976).

**\*10** In Lovelace v. Lee, the Fourth Circuit reached the same conclusion. 472 F.3d 174, 201 (4th Cir. 2006). It reasoned that "the operative word 'prohibit' in the First Amendment," like the word "deprive" in the Fourteenth, "connotes a 'conscious act' rather than a merely negligent one." Id. (citing Daniels v. Williams, 474 U.S. 327, 331 (1986)). [8] There, the plaintiff-prisoner claimed that he was denied the right to fast or participate in religious services during Ramadan. Id. The court vacated the district court's grant of summary judgment because there was a genuine issue of material fact concerning whether the defendants "acted intentionally in depriving [the plaintiff] of his free exercise rights." Id. at 202. Thus, the Court did not require a more culpable state of mind, like discriminatory animus. Id.; cf. Kingsley v. Hendrickson, 135 S.Ct. 2466, 2472 (2015) (holding that "force purposefully or knowingly used" against a pretrial detainee violates the Fourteenth Amendments long as it is "objectively unreasonable," even if the officer did intend that the force be excessive). [9]

[8]      In Daniels, the Supreme Court held that the word "deprive" in the Due Process Clause of the Fourteenth Amendment implies a "*deliberate* decision." 474 U.S. 327, 331 (1986). Later, it clarified that it is the official's "state of mind with respect to ... the] physical consequences" of his actions, but not with respect to the "interpretation of those actions" that must be "deliberate"—that is, to "deprive" an inmate of due process, a prison guard must apply force "purposefully or knowingly," but need not intend that the force be "excessive or harmful. Kingsley v. Hendrickson, 135 S.Ct. 2466, 2472 (2015). Applying the framework in Kingsley to the First Amendment would mean that an official who purposefully or knowingly imposes a burden on religion need not know the burden is objectively "substantial. However, that is a matter to be addressed, if necessary, when crafting jury instructions.

[9]      Reckless actions or omissions might also qualify as "deliberate" conduct that "prohibit[s]" the free

exercise of religion—just as they constitute deliberate conduct that "deprives" a pretrial detainee of due process, Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017), or "inflicts" cruel and unusual punishment, Farmer v. Brennan, 511 U.S. 825, 836 (1994). The Court need not decide the issue for the purposes of this motion.

Defendants, however, reject the standard applied in Salahuddin, Ford, Young, and Lovelace. They argue that it is not enough that officials act (or fail to act) intentionally; they must also have a discriminatory motive. For support, they point to the Supreme Court's statement in Ashcroft v. Iqbal that "[w]here the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose." 556 U.S. 662, 676–77 (2009) (citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 54 41 (1993)). The Court in Iqbal cited Equal Protection cases explaining that "purposeful discrimination requires more than intent as ... awareness of the consequences"—"[i]t instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." Id. However, as this passage and the cited cases indicate, the Court in Iqbal referred to the standard for alleging a claim of "invidious discrimination" and did not purport to change the standard applicable to all free exercise claims.

In particular, the plaintiff in Iqbal sued high executive officials for a broad Department of Justice policy of "religious discrimination:" targeting Muslim men for restrictive confinement "solely on account of [their] religion, race, and/or national origin." Id. at 669. He did not assert that the law placed a "substantial burden" on any religious practice. Such a claim may well have been futile; by 2009, Supreme Court precedent had established that (with limited exceptions) "generally applicable" policies may constitutionally burden religion unless they are shown to have a discriminatory purpose or single out religious conduct for disfavored treatment. See Seabrook v. City of New York, 210 F.3d 355 (2d Cir. 2000) ("It is not a violation of the Free Exercise Clause to enforce a generally applicable rule, policy, or statute that burdens a religious practice, provided the burden is not the object of the law but merely the 'incidental effect' of an otherwise valid neutral provision.") (citing Emp. Div., Dep't of

[Human Res. of Oregon v. Smith](#), 494 U.S. 872, 879 (1990)).

**\*11** Here, in contrast, Plaintiff does not challenge any "generally applicable rule;" rather, he challenges case-specific decisions that undisputedly applied *only* to NOI adherents and interfered with their rights to engage in identified religious practices. DOCCS regulations gave prison officials discretion to allow inmates to attend congregate services on request, DOCCS Directive 4202 §§ III(A)(2), VI, and Coxsackie officials permitted members of other religions to attend congregate religious services, including Jumu'ah. Dkt. No. 33-4 at 17. Plaintiff challenges Reddie's decision to withhold an accommodation available to inmates of other religions. Such an action, which "singles out" a certain religion "in a selective manner," does not apply a "generally applicable" rule; therefore, Smith does not shield it from constitutional scrutiny. [Lukumi, 508 U.S. at 543, 537](#) (explaining that "in circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without compelling reason"). For that reason, "close scrutiny of laws singling out a religious practice for special burdens is not limited to the context where such laws stem from animus" or "religious hostility." [Cent. Rabbinical Cong. of U.S. & Canada v. N.Y.C. Dep't of Health & Mental Hygiene, 763 F.3d 183, 197 (2d Cir. 2014)](#). Accordingly, cases like Ford, Salahuddin, and McEachin — "where generally applicable prison policies were designed to accommodate inmates' religious ... requirements, but the same allowances were not made for inmates subjected to disciplinary restrictions," [357 F.3d at 204](#) — are still good law. And they still teach that unjustified, selective burdens on religious exercise violate the Free Exercise Clause regardless of the actor's motives. Id. [0]

[10]   Other courts have reached the same conclusion after Iqbal. See [Thompson v. Holm, 809 F.3d 376, 381 (7th Cir. 2016)](#) (holding that "a prisoner has a clearly established right to a diet consistent with his religious scruples including proper food during Ramadan" and that "because the evidence supports an inference that the defendants intentionally and unjustifiably forced this burdensome choice on [the plaintiff], qualified immunity is unavailable") (citing [Ford, 352 F.3d at 597](#)); [Refaat El Badrawi v. United States, No. 07 CV 1074, 2011 WL 13086946, at *4 (D. Conn. May 16, 2011)](#) (rejecting argument that Iqbal requires

intentional discrimination to violate the free exercise clause). Indeed, in a case alleging that a jail chaplain denied an individual inmate's request for a kosher diet, the Tenth Circuit denied qualified immunity and noted that it could not locate a "single authority holding "that a conscious or intentional interference with an inmate's] right to free exercise ... is consistent with the First Amendment." [Ralston v. Cannon, 884 F.3d 1060, 1067 (10th Cir. 2018)](#).

*i. Jumu'ah*

A reasonable jury could find that Reddie intentionally ignored Plaintiff's and other NOI members' requests to hold Jumu'ah services for the NOI community.

Reddie asserts that he did not know about the Jumu'ah issue until November 2015, when Plaintiff filed his grievance, and fixed it soon after. R. & R. at 21. But substantial evidence supports Plaintiff's opposing position: that Reddie knew about Plaintiff's sincere belief that Islam mandated his participation in Jumu'ah services, and Plaintiff's requests for such services, as early as June 2015. Plaintiff states in his sworn Complaint that on June 23, 2015, he wrote Reddie a letter requesting Friday Jumu'ah services. Compl. ¶ 2; Dkt. No. 33-2 at 125 ("June 23, 2015 Letter"). In his deposition, Plaintiff testified that he put his name on the letter, stamped it, addressed it to Reddie, and placed it in the Coxsackie internal mail system. Dkt. No. 33-2 at 226. In Grullon, the Second Circuit held such facts — "indicating that [a] [l]etter was sent to [a prison warden] at an appropriate address and by appropriate means" — permitted "the reasonable inference ... that the Warden in fact received the letter, read it, and thereby became aware of the conditions of which [the prisoner] complained." [720 F.3d at 141](#). The Court explained:

> It is of course possible that the Warden read the Letter and took appropriate action or that an administrative procedure was in place by which the Warden himself would not have received the [l]etter addressed to him; but those are potential factual issues as to personal involvement that

likely cannot be resolved without development of a factual record.

720 F.3d at 141.

Grullon was decided at the pleading stage. However, its reasoning applies here, on summary judgment, because Plaintiff testified that he properly addressed and sent the letter in the prison mail system, and Reddie has not developed a "factual record" establishing Plaintiff's letter never reached him. "There is a rebuttable [evidentiary] presumption that a letter which is mailed is received by the addressee," and [p]roof of mailing may be established ... offering testimony of the person who actually mailed the letter." Mount Vernon Fire Ins. Co. v. E. Side Renaissance Assocs., 893 F. Supp. 242, 245 (S.D.N.Y. 1995); accord Hagner v. United States, 52 S. Ct. 417, 419 (1932) ("The rule is well settled that proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed."). "[T]he fact that receipt of the letter subjects the person sending it to a penalty does not alter the rule." Hagner, 285 U.S. at 430. Reddie's general "denial of receipt, standing alone, is insufficient to rebut the presumption." Mount Vernon, 893 F. Supp. at 246. Accordingly, the jury could reasonably infer that Reddie received and read Plaintiff's letter in June and disbelieve Reddie's testimony to the contrary.

*12  Plaintiff's letter, however, is not the only evidence suggesting that Reddie knew NOI inmates needed to attend Jumu'ah services. Hill's letter indicates that NOI prisoners complained to Reddie about Jumu'ah services as early as June 2015. The letter states that members of the NOI had already gone "to the current Coordinating Chaplain of Religious Affairs, Father Reddie," with their concerns, including the lack of Jumu'ah services on Fridays. Hill Letter at 25, 27. Although the letter is undated, McCoy received and responded to it by June 19, 2015, indicating that Hill sent his letter properly before that date. Dkt. No. 42-1 ("McCoy Letter") at 31. Plaintiff's November letter to Superintendent Martuscello corroborates that, contrary to Reddie's testimony, NOI members raised the Jumu'ah issue with him before November 2015 as Defendants contend. Dkt. No. 33-5 ("Martuscello Declaration") at 5 6, ¶ 19 (quoting November letter stating that "several members

[of the NOI] explain[ed] this [Jumu'ah] issue to Chaplain Ready [sic] and he failed to accommodate the NOI with daytime services").

Finally, McCoy's response to Hill's letter states that Coxsackie staff "was contacted regarding [Hill's] allegation and concerns." Id. It states that "staff ha[d] informed [his office] that ... the Coordinating Chaplain [was] working with the NOI adherents to address religious needs" and stated that "all additional concerns should be addressed to the Coordinating Chaplain." Id. Defendants admit the "Coordinating Chaplain" was Reddie. Supp. Mem. at 8. This lends additional support to Hill's statements that by mid-June 2015, NOI members had already raised the concerns in his letter, including the Jumu'ah issue, with Reddie and it supports the conclusion that the ball was in Reddie's court. The jury could therefore conclude that Reddie was substantially certain that if he did not arrange for NOI Jumu'ah services, they would not be held for the remainder of Ramadan and beyond.

Indeed, there is substantial evidence that Reddie was at least partially responsible for accommodating Plaintiff's religious need for congregate Jumu'ah services. As Coordinating Chaplain for Coxsackie, Reddie was "assigned the responsibility for coordination of the total facility religious program and related administrative tasks" and "for meeting the needs of inmates who ascribe to emerging religious faiths." DOCCS Directive 4200 § III(A)(2). In addition, as the McCoy Letter indicated, because Reddie was the "covering staff advisor" for the NOI, NOI members could "address religious inquiries and concerns" to him. Dkt. No. 33-4 ("Reddie Declaration") at 2, ¶ 2; see also Dkt. No. 33-3 ("Barringer Declaration") at 1, ¶ 2 (stating that staff advisors were responsible for "oversee[ing]" their assigned faith); Defs' SOF ¶ 5, 8 (stating that staff advisors oversaw religious programs for particular faiths and "the NOI community could address religious inquiries and concerns to Reddie"). Therefore, the evidence is sufficient for a jury to find that Reddie was responsible for acting on NOI members' requests to attend Jumu'ah services by relaying the request to the superintendent, if necessary.

11    The Court s own review of the record and applicable regulations indicates that it is possible that Reddie would have had to request the Superintendent s permission to accommodate the NOI s request to

attend Jumu'ah services on Fridays. See DOCCS Directive 4202§ VI(B)(2) (3) (indicating that the superintendent will decide "requests ... to observe their congregational worship services"). However, Defendants do not argue that this is significant to the personal involvement analysis.

### ii. Savior's Day

There is also a genuine dispute of material fact concerning whether Reddie was personally involved in rescheduling the Savior's Day event.

**\*13** In addition to his responsibilities listed earlier, as the staff advisor for the NOI, Reddie was "responsible for setting up each event" for holy days listed in the DOCCS religious calendar, which included the Savior's Day program. Dkt. No. 33-3 at 64. In addition, DOCCS regulations charged him, as Coordinating Chaplain, to "coordinate the various religious functions and the use of designated religious space" and to consult with the Superintendent to "resolve any conflicts pertaining to the scheduling and conduct of worship services." DOCCS Directive 4202 §§ V, VI(B)(5). The Central Office Review Committee, in response to Plaintiff's grievance concerning the Savior's Day postponement, advised Plaintiff and the other grievants to "address further concerns" regarding Holy Day observances "to the Coordinating Chaplain," Reddie, "for the most expeditious means of resolution." Defs' SOF ¶ 40. Consistent with those descriptions of his responsibilities, it was Reddie who "recognized that there would be clashes because of a total lack of space for all events which were scheduled" on October 7, 2015, conferred with Barringer, and asked for the NOI community's consent to reschedule the event. Defs' SOF ¶ 31. And Plaintiff testified in his deposition that it was Reddie who told him and the other NOI members that the Savior's Day event was cancelled. Dkt. No. 33-2 at 234. [2] Based on these facts, the jury could reasonably conclude that Reddie intentionally and substantially influenced the decision to postpone the Savior's Day services and, therefore, violate Plaintiff's clearly established rights.

[12]      That said, Plaintiff points to no evidence that Reddie failed to submit the paperwork necessary to schedule the event. In his objection, Plaintiff states that Reddie s response to Plaintiff Interrogatory 23 admitted that he failed to do so. However, that Interrogatory asked: "Defendant Reddie, is it true

that you never submitted an event packet to the Deputy Superintendent of Programs requesting the NOI community be allowed to celebrate Savior s day and the Holy day of Atonement in a timely manner? Dkt. No. 33 2 at 398. Reddie responded, "No, indicating that he did submit the required paperwork. Id. at 593 94.

### B. Remaining Claims Against Reddie

Plaintiff also alleges that Reddie: (1) cancelled several NOI Islamic study classes, with the last cancellation occurring on December 15, 2015, Dkt. No. 33-2 at 282; (2) denied Plaintiff religiously-mandated showers before Jumu'ah services, including on January 8, 2016; (3) routinely called Plaintiff out of his cell too late to partake in full religious services; and (4) ordered Plaintiff to break has religious fast too early (before sunset) on Savior's Day, February 26, 2016. Compl. ¶¶ 11 12, 13 16, 17. [3] The Magistrate Judge concluded that Plaintiff failed to present evidence demonstrating Reddie's personal involvement in any of these decisions. R. & R at 26.

[13]      The Nation of Islam has two Savior s Days per year on the anniversaries of the births of Wallace Fard Muhammad (February 26) and Elijah Muhammad (October 7). Dkt. No. 33 3 at 48.

The Court agrees. Plaintiff's objections do not explain how Reddie knew of or participated in the decisions to deny NOI inmates showers before Jumu'ah, issue late call-outs, or force them to break their fast on Savior's Day 2016. Obj. at 6 8. In particular, as to Savior's Day 2016, Reddie testified via affidavit that he instructed the inmates to prepare to leave the chapel for the mess hall at 5:00 p.m., that they left at 5:32 p.m., that the meal was not served until 5:38 p.m., and that sunset was at 5:40 p.m. Dkt. No. 33-4 ¶ 11. Plaintiff contends that Reddie and another officer ordered the inmates to eat earlier. Dkt. No. 33-2 at 327. However, Plaintiff agrees that sunset was at 5:40 p.m., id., and he could not recall what time Reddie ordered the inmates to proceed from the chapel to the mess hall, id. at 330 33. His belief that the inmates ate before sunset is based on hearsay; he heard the NOI inmate facilitator tell Reddie as much. Id. at 330 33. Plaintiff does not present any evidence concerning how the facilitator knew the time or whether the sun had set. In any event, Plaintiff concedes that it was a Sergeant Donovan, not Reddie, who gave the order to eat. Id. at 325; Opp'n at 12 ¶ 105. Accordingly, Plaintiff has not provided enough evidence for a jury to

conclude the inmates broke their fast prematurely or, if they did, that Reddie was responsible.

The Court also agrees that Reddie was uninvolved in the cancellation of Islamic study classes. As Plaintiff points out in his objection, Hill's May or June 2015 letter to Barringer and Reddie supports the conclusion that Reddie and Barringer knew that Islamic study classes were frequently cancelled because of some non-party prison officials' misunderstanding that the classes could not be held when Reddie was absent. Hill's letter "ask[ed] ... why [NOI] classes [were] continuously cancelled," more than "any other religious organization at Coxsackie," and noted that NOI inmates had "tried ... to speak to our current Chaplain, Father Reddie, about our concern." Dkt. No. 42-1 at 29. Hill wrote that Reddie told NOI inmates that "the reason ... NOI classes [were] cancelled [was] because he [was] not present at the facility at the time of [the] classes"   even though "per Directive, as long as an inmate facilitator is present, classes of chosen faith must be open for registered members to exercise their religious right." Id. Prison administration (specifically, the Central Office Review Committee) later confirmed that prison regulations allowed classes to be held with an inmate facilitator, rather than Reddie. Defs' SOF ¶ 77. A reasonable jury could therefore conclude that Reddie knew that given his other responsibilities, he might be unavailable to host a future study class and, therefore, a misguided official might cancel the class again. Indeed, on December 15, 2015, a correctional officer again cancelled the weekly class because Reddie was not present to host it. Defs' SOF ¶ 66. However, at most, this proves that Reddie was negligent (ignored an unreasonable risk that the classes would be cancelled), not that he intended the resulting cancellation(s). Such conduct "amounting to nothing more than negligence is not actionable under the First Amendment." Riehl v. Martin, No. 13-CV-439, 2014 WL 1289601, at *10 (N.D.N.Y. Mar. 31, 2014) (citing Lovelace, 472 F.3d at 201); accord Ralston, 884 F.3d at 1067 nn. 3, 8.

**\*14** In addition, a reasonable official in Reddie's position would not have thought that cancelling Islamic studies classes on several occasions placed a "substantial" burden on Plaintiff's religious exercise. Plaintiff has not submitted any testimony indicating that he considers the classes "central or important to the ... practice of his religion," Williams, 639 F. App'x at 57, or that cancelling them put "substantial pressure on [him] to modify his behavior

and to violate his beliefs," Jolly, 76 F.3d at 477. As explained earlier, missing only a few weekly religious gatherings over a six-month period has consistently been held an insubstantial burden the exercise of a prisoner's religion. See Hanton v. Mathiau, 29 F. App'x 772, 773 (2d Cir. 2002) (affirming summary judgment on free exercise claim because "being unable to attend religious services on two days during a three month period" did not constitute a "substantial" burden" on religion); see also Smith v. Graziano, No. 08-CV-469, 2010 WL 1330019, at *9 (N.D.N.Y. Mar. 16, 2010), adopted, 2010 WL 1332503 (Apr. 6, 2010) (same). At the very least, controlling precedent has not "placed the ... question beyond debate." Al-Kidd, 563 U.S. at 741. If Reddie intended (or perhaps if he acted recklessly regarding) the cancellations, the jury could consider them along with the lack of Jumu'ah services to assess whether it would have been unreasonable for Reddie to think that the overall interference with Plaintiff's religious exercise was "substantial." Salahuddin, 467 F.3d at 273. Nevertheless, the evidence does not suggest that Reddie knew that more classes would be cancelled. Thus, the jury could not conclude that the cancellations were part of any burden Reddie personally placed, or caused to be placed, on Plaintiff's religious exercise.

### C. Equal Protection Claims Against Martuscello and Barringer

Plaintiff's final objection is to the Magistrate Judge's recommendation to dismiss his Fourteenth Amendment Equal Protection claims against Barringer and Maruscello. Unlike the Free Exercise Clause of the First Amendment, the Equal Protection Clause requires a plaintiff, "in order to survive a motion for summary judgment," to "come forward with at least some credible evidence that the actions of the individual [defendants] were motivated by [religious] animus or ill-will." Grillo v. New York City Transit Auth., 291 F.3d 231, 234 (2d Cir. 2002). The Court agrees with the Magistrate Judge that Plaintiff has failed to do so. There is no evidence that Martuscello knew Plaintiff's religion mandated attendance at Jumu'ah services until Plaintiff's November 2015 grievance educated them. Dkt. No. 33-5 ("Martuscello Declaration") at 4 5. Though Martuscello initially indicated that he would deny Plaintiff's request to attend those services, he promptly asked Barringer to request permission fromm the DOCCS Central Office to hold Jumu'ah services for NOI inmates on Friday mornings, and the Central Office approved the services to

begin on January 8, 2019. Id. at 6, 26, 55; see also Barringer Decl. at 3.

The jury might reasonably determine that since McCoy received Hill's letter, the other addressees, including Reddie and Barringer, probably received it too. However, even if Barringer received Hill's letter in June 2015, his responsibility for religious programs at Coxsackie was supervisory; unlike Reddie, he was not responsible for addressing inmates' requests in the first instance. Defs' SOF ¶ 5; Opp'n at 9, ¶ 5. "It is well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find that the defendant was personally involved in the deprivation alleged." Rodriguez v. Rock, No. 13-CV-01106, 2015 WL 5147045, at *6 (N.D.N.Y. Sept. 1, 2015) (dismissing similar religious claim against a deputy superintendent of programs to whom plaintiff sent complaint letter, while upholding claims against line officers who ignored plaintiff's complaints). Supervisory officials are entitled to expect prisoners to take complaints through the "proper channels" and do not proximately cause violations of prisoners' rights by forwarding complaints to the officials with primary responsibility to address the issue. Id.; Mateo v. Fischer, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) (explaining that supervisory officials "receive large numbers of letters from inmates" and they "delegate subordinates to handle them;" reasoning that if courts found supervisors liable "every time a supervisor forwarded a complaint to a subordinate, the [personal involvement] requirement would lose all meaning"). The record shows that Barringer deferred to McCoy to respond to Hill's letter, and McCoy directed Hill to address his unresolved religious concerns to Reddie. McCoy Letter at 31. Plaintiff points to no evidence that Barringer had a duty to address the Jumu'ah requests or that he refused to do so because of discriminatory animus instead of the justified assumption that Reddie would handle the issue.

**\*15** Thus, a rational jury could not infer that Martuscello or Barringer intentionally deprived Plaintiff of Jumu'ah services based on "religious animus or ill will." Grillo, 291 F.3d at 234.

Plaintiff also offered no evidence — and has not explained how he has personal knowledge — to support his claim that the defendants allowed Sunni Muslims, but not NOI adherents, to shower before services, R. & R. at

31, and nothing to support a finding that Martuscello or Barringer were involved in the other alleged equal protection violations, R. & R. at 32–33.

Accordingly, Plaintiff's equal protection claims must be dismissed.

### D. RLUIPA

Section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") "protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." Salahuddin, 467 F.3d at 273 (quoting 42 U.S.C. § 2000cc-1(a)). "RLUIPA creates a private right of action for violations of § 3." Id. (citing § 2000cc-2(a)). "Section 3 applies if 'the substantial burden [on religious exercise] is imposed in a program or activity that receives Federal financial assistance.' " Id. (quoting § 2000cc-1(b)(1)). "In the prison context, this section sweeps broadly, as '[e]very State ... accepts federal funding for its prisons.' " Id. (quoting Cutter v. Wilkinson, 544 U.S. 709, 716 n. 4 (2005)). In Salahuddin, "because the unchallenged and unresolved factual allegations as viewed in the light most favorable to [the plaintiff] establish[ed] that [his] free-exercise rights were substantially burdened by" two restrictions on religious services that were "not justified by a legitimate penological interest," the court held that "a fortiori" it could not grant summary judgment under the stricter standards of RLUIPA. Salahuddin, 467 F.3d at 275–78. Here, because the evidence also creates genuine dispute of fact concerning whether Reddie violated the Free Exercise Cause, the same is true concerning Plaintiff's rights under RLUIPA.

However, the Court appears to have overlooked RLUIPA in its May 2017 Order identifying Plaintiff's claims, even though it was required to "liberally construe his pleadings" and "interpret his complaint to raise the strongest arguments it suggests." Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007); see also Young v. Goord, 67 F. App'x 638, 640 (2d Cir. 2003) (reversing dismissal of pro se complaint alleging only free exercise claim because the plaintiff "may [have been] able to state a claim under RLUIPA"). As a result, the parties did not address RLUIPA in their summary judgment papers. The Court will therefore give Reddie fourteen days to lodge

2019 WL 1397006

any objection to the Court's deeming the Complaint to include a RLUIPA claim.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 39) is **ADOPTED** to the extent that it dismisses the claims against Martuscello and Barringer and **MODIFIED** in that the claim against Reddie survives summary judgment; and it is further

**ORDERED**, that the Motion for Summary Judgment (Dkt. No. 33) is **GRANTED** in part and **DENIED** in part as set forth above; and it is further

**\*16 ORDERED**, that Reddie shall, within **fourteen days** of the filing date of this Memorandum-Decision and Order, state whether he objects to the Court's deeming the Complaint to include a claim under RLUIPA. If he objects, Reddie shall state whether the addition of a RLUIPA claim based on the facts alleged in the Complaint would prejudice him under the standard of Foman v. Davis, 371 U.S. 178, 182 (1962), or any other applicable rule. He shall also specify what further discovery, if any, he would require if such a claim were added.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 1397006

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Supplemented by A'Gard v. Locke, N.D.N.Y., August 17, 2016

2016 WL 8735653
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenith M. A'GARD, Plaintiff,

v.

N. LOCKE,[1] et al., Defendants.

[1] Defendant Locke was sued by plaintiff as N. Lock. *See* Dkt. No. 1 at 7. The clerk of the court will respectfully be directed to revise the docket in this matter to reflect the correct spelling of defendant Locke's name.

Civil Action No. 9:14-CV-0613 (GTS/DEP)
|
Signed 06/24/2016

**Attorneys and Law Firms**

KENITH M. A'GARD, 10-A-3008, Shawangunk Correctional Facility, P.O. Box 700, Wallkill, NY 12589, Pro Se.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN, New York State Attorney General, OF COUNSEL: CHRISTOPHER J. HUMMEL, ESQ. Assistant Attorney General, The Capitol, Albany, NY 12224.

REPORT, RECOMMENDATION AND ORDER

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** *Pro se* plaintiff Kenith M. A'Gard, a New York State prison inmate, has commenced this action against several defendants, both named and unidentified "Doe" defendants, all of whom are corrections employees stationed at the prison facility in which plaintiff was confined at the relevant times, pursuant to 42 U.S.C. § 1983, alleging the deprivation of his civil rights. Liberally construed, plaintiff's complaint asserts claims under the Eighth Amendment for (1) failure to protect, against defendant Nathan Locke and four unnamed individuals, based on allegations that they failed to take reasonable

steps to prevent plaintiff from being assaulted by a fellow inmate, and (2) deliberate medical indifference, against an unidentified nurse, based on allegations that she provided inadequate medical care following the assault on plaintiff.

Currently pending before the court are cross-motions brought by defendant Locke and the plaintiff, each seeking the entry of summary judgment in their favor. For the reasons set forth below, I recommend that plaintiff's motion be denied and defendant Locke's motion be granted. In addition, based on the record evidence adduced by defendant Locke in support of his motion, which demonstrates his knowledge as to the identities of the Sergeant John Doe and Lieutenant John Doe named as defendants in the complaint, the previous efforts of plaintiff to identify these defendants, and my recommendation with respect to the claim asserted against defendant Locke, defense counsel will be directed to provide plaintiff with the names of these individuals.[2] Finally, in light of plaintiff's failure to take reasonable steps to identify and join the other unnamed defendants in this action during the pendency of discovery and the absence of any record evidence that would appear to support a claim against any of those defendants, I recommend that the claims asserted against the remaining three unnamed defendants be dismissed without prejudice for failure to prosecute.

[2] After plaintiff has been provided with the true names of Sergeant John Doe and Lieutenant John Doe, plaintiff will be granted leave to amend his complaint, after which point the court will issue a new scheduling order allowing for limited discovery relative to the Eighth Amendment claim asserted against these defendants.

I. BACKGROUND[3]

[3] In light of the procedural posture of the case, the following recitation is derived from the record now before the court. Ordinarily, when a motion for summary judgment is made, the record evidence is construed with all inferences drawn and ambiguities resolved in the non moving party's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). In this case, in light of the parties' cross motions, the court draws "all factual inferences ... against the party whose motion is under consideration. *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) (quotation marks omitted). It is worth noting that,

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

Case 9:17-cv-01229-DNH-TWD    Document 24    Filed 07/08/19    Page 70 of 91

generally, the material facts underlying plaintiff's claim against defendant Locke in this matter are not in dispute.

**\*2** Plaintiff is a New York State prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Dkt. No. 1. While he is now incarcerated at the Shawangunk Correctional Facility, at the times relevant to his claims in this action, plaintiff was confined in the Upstate Correctional Facility ("Upstate"), located in Malone, New York. [4] *Id.* at 6.

[4]     Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU ) cells in which inmates are confined for twenty three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01 CV 8235, 2002 WL 31040370, at \*4 n.11 (S.D.N.Y. Sept. 12, 2002).

Plaintiff arrived at Upstate on April 19, 2013. Dkt. No. 63 at 4. Upon his arrival, he was assigned to a double-occupancy cell with inmate James Heath following an assessment of his suitability and compatibility for double-cell housing. [5] *Id.*; Dkt. No. 53-3 at 3, 16. Accompanied by defendants Corrections Officers Doe 1 and Doe 2, defendant Locke escorted plaintiff to his cell as instructed by his area supervisor, a sergeant. Dkt. No. 53-2 at 2. Upon the group's arrival at the cell, Inmate Heath refused to allow plaintiff to enter, told defendant Locke and the other officers that he did not want plaintiff in the cell with him, and became "hostile." Dkt. No. 1 at 15; Dkt. No. 63 at 4; Dkt. No. 53-1 at 11-12; Dkt. No. 53-2 at 2. Defendant Locke then informed his sergeant by radio communication of Inmate Heath's behavior. Dkt. No. 63 at 4; Dkt. No. 53-1 at 11; Dkt. No. 53-2 at 2. Plaintiff was escorted back to a holding pen, and defendant Locke met with the Sergeant and Lieutenant Watch Commander to discuss the situation. Dkt. No. 63 at 4; Dkt. No. 53-1 at 13-14; Dkt. No. 53-2 at 2. According to defendant Locke, defendant Sergeant Doe "then ordered [him], along with [his] fellow officers, to escort plaintiff ... into the cell." Dkt. No. 53-2 at 2; *see also* Dkt. No. 63 at 4-5. Defendant Locke, in the company of Sergeant John Doe and two other officers, then escorted plaintiff back to the cell. Dkt. No. 53-2, at 3.

[5]     Although plaintiff refers to this individual as "Scott Heath  in his complaint, *see, e.g.,* Dkt. No. 1 at 1, 8, it appears the inmate who plaintiff intends to reference

is "James Heath,  DIN 03 B 2618. *See* Dkt. No. 63 at 4.

Prior to plaintiff's entry into the cell, defendant Lieutenant Doe allegedly told plaintiff in the presence of defendant Locke that he wanted plaintiff to "kick [Inmate] Heath's ass." Dkt. No. 53-1 at 14-15; *see also* Dkt. No. 1 at 15. Once plaintiff was locked in his new cell, defendant Locke returned to his post. Dkt. No. 53-2 at 3.

Shortly after plaintiff was locked into the cell, he was assaulted by Inmate Heath. Dkt. No. 1 at 15; Dkt. No. 63 at 5-6. Defendant Locke responded to the cell and issued plaintiff a misbehavior report based on the incident. Dkt. No. 1 at 17; Dkt. No. 1-1 at 1; Dkt. No. 53-2 at 3, 6. Although the misbehavior report issued to plaintiff suggests that defendant Locke witnessed Inmate Heath and plaintiff "exchanging striking blows," [6] plaintiff disputes this, [7] and a declaration submitted by defendant Locke in support of his motion for summary judgment is vague regarding this point. *See* Dkt. No. 53-2 at 3. In any event, defendant Locke wrote in a misbehavior report issued concerning the incident that "Inmate Agard, K Din #10A3008 did not appear to be the aggressor but was attempting to defend himself." Dkt. No. 1-1 at 1; Dkt. No. 53-2 at 6.

[6]     *See, e.g.,* Dkt. No. 1 1 at 1.

[7]     *See* Dkt. No. 1 at 25; Dkt. No. 63 at 5.

**\*3** Following plaintiff's altercation with Inmate Heath, he was taken out of the cell and seen by medical staff. Dkt. No. 53-2 at 3. Plaintiff claims that Nurse Jane Doe, a defendant in this action, acted with deliberate indifference to his serious medical needs by failing to provide adequate medical care to address his injuries, which allegedly included "a concussion, a split-lip, a stab wound to the left side of the nose, chipped and cracked teeth, and a swelling to [his] face and skull." Dkt. No. 1, at 44.

Plaintiff contends that his "Institutional History" records reflect that he "was not suppose[d] to be in 'double-occupancy-housing' at Upstate" and that he is " ' victim prone.' " Dkt. No. 1 at 19, 21. Plaintiff testified at his deposition in this matter that he informed defendant Locke, prior to being escorted into Inmate Heath's cell, that he "couldn't double bunk." Dkt. No. 53-1 at 16. In addition, plaintiff contends, and there is no evidence

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

Case 9:17-cv-01229-DNH-TWD    Document 24    Filed 07/08/19    Page 71 of 91

disputing, that defendant Locke was aware that Inmate Heath had a history of violence against other prisoners while incarcerated at Upstate. Dkt. No. 1 at 24; Dkt. No. 63 at 5 & n.2. Defendant Locke maintains that he "had no authority to change the approval of plaintiff to be housed with Inmate Heath." Dkt. No. 53-2 at 3.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on May 27, 2014, with the filing of a complaint and accompanying applications to proceed *in forma pauperis* ("IFP") and for permission to proceed in the action anonymously, utilizing a pseudonym, for safety reasons.[8] Dkt. Nos. 1-3. Named as defendants in plaintiff's complaint were Corrections Officer N. Locke, Inmate James Heath, Deputy Superintendent Rock, Inspector General Vern Fonda, Administrative Assistant Chad Powell, Nurse Doe, Corrections Officers Doe 1 and Doe 2, Corrections Sergeant Doe, and Corrections Lieutenant Doe. Dkt. No. 1 at 1, 6-10. On December 23, 2014, Chief District Judge Glenn T. Suddaby issued a decision and order pursuant to 28 U.S.C. §§ 1915(e)(2)B(ii), 1915A(b) in which he (1) granted plaintiff's IFP application; (2) denied plaintiff's request to proceed under a pseudonym in this action; and (3) dismissed all of plaintiff's claims, except plaintiff's Eighth Amendment failure to protect claim asserted against defendants Locke, Corrections Officers Doe 1 and 2, Corrections Lieutenant Doe, and Corrections Sergeant Doe, and plaintiff's Eighth Amendment deliberate medical indifference claim against Nurse Doe. *See generally* Dkt. No. 14.

[8]    Plaintiff's original IFP application was denied as incomplete on June 3, 2014. Dkt. No. 6. Plaintiff thereafter filed a renewed and complete request on June 10, 2014. Dkt. No. 7.

Following the close of discovery, defendant Locke filed a motion seeking the entry of summary judgment in his favor on December 24, 2015. Dkt. No. 53. In his motion, defendant Locke argues that no reasonable factfinder could conclude he is liable for failing to protect plaintiff from Inmate Heath's attack, and, in any event, he is entitled to qualified immunity from suit. *See generally* Dkt. No. 53-5. Plaintiff filed a response to defendant Locke's motion on February 4, 2016, which he has characterized as a cross-motion for summary judgment. Dkt. No. 63. Defendant Locke subsequently filed an

opposition to plaintiff's cross-motion on March 15, 2016. Dkt. No. 67.

The pending motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Plaintiff's Cross-Motion for Summary Judgment and Failure to Respond to Defendant Locke's Statement of Material Facts

**\*4** Although plaintiff characterizes his response to defendant Locke's motion as a " 'cross-motion' for summary judgment," and "submits that plaintiff's complaint and the relief requested be granted in its entirety," Dkt. No. 63 at 1, 3, his submission fails to comply with the local rules of this court governing motion practice. In particular, Local Rule 7.1 requires a moving party to submit a "supporting affidavit," as well as a statement of material facts. N.D.N.Y. L.R. 7.1(a)(2)-(3). In this case, plaintiff has submitted only a memorandum of law in support of his cross-motion. Dkt. No. 63. Because plaintiff has not complied with the applicable local rules governing motion practice by including an affidavit and statement of material facts, I recommend that his motion be denied. *See, e.g., Riley v. Town of Bethlehem*, 5 F.Supp.2d 92, 93 (N.D.N.Y. 1998) (dismissing summary judgment motion based on moving party's failure to file a properly supported Local Rule 7.1 Statement of Material Facts).

Plaintiff's failure to respond to the Local Rule 7.1(a)(3) Statement submitted by defendants in support of their motion is also significant. By its terms, Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases).[9] Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F.Supp. 406, 415

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    3

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

Case 9:17-cv-01229-DNH-TWD Document 24 Filed 07/08/19 Page 72 of 91

(N.D.N.Y. 1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

9    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

Here, because plaintiff was warned of the consequences of failing to properly respond to defendant Locke's statement of material facts, *see* Dkt. No. 53 at 2; Dkt. No. 54 at 2, but nonetheless has failed to do so, I recommend that the court deem the facts contained in defendant's statement as having been admitted, to the extent they are supported by accurate record citations. *See, e.g., Latouche*, 2011 WL 1103045, at *1; *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendant Locke's statement of material facts, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry*, 336 F.3d 1 at 137.

B. Defendant Locke's Motion

1. Legal Standard Governing
Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*5** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

2. Merits of Plaintiff's Claim
Asserted Against Defendant Locke

Plaintiff asserts an Eighth Amendment failure to protect claim against Corrections Officer Locke based on allegations that he was aware of the risk of harm plaintiff faced from Inmate Heath prior to being escorted and housed in his cell. *See generally* Dkt. Nos. 1, 63. Defendant Locke contends that, even assuming plaintiff's allegations are true, he had no authority to change plaintiff's housing assignment, and, therefore, he is not responsible for violating plaintiff's constitutional rights. [0] *See generally* Dkt. No. 53-5.

10    Defendant Locke also argues that he was unaware that plaintiff was a homosexual and victim prone prior to directing plaintiff to bunk with Inmate Heath. Dkt. No. 53 5 at 8 9. Whether this is true is not relevant because plaintiff's claim is based on allegations that defendant Locke was aware that (1) plaintiff could not double bunk, (2) defendant

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

Case 9:17-cv-01229-DNH-TWD    Document 24    Filed 07/08/19    Page 73 of 91

Sergeant Doe told plaintiff to fight Inmate Heath, (3) Inmate Heath refused to permit plaintiff to enter the cell, and (4) Inmate Heath had a history of assaulting other prisoners while at Upstate.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]' " *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)); *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

Law enforcement officers have a duty to intervene and prevent a cruel and unusual punishment, prohibited by the Eighth Amendment, from occurring or continuing. *Farmer*, 511 U.S. at 836 (1994); *Hayes v. N.Y. City Dep't of Corrs*, 84 F.3d 614, 620 (2d Cir. 1996); *see also Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) ("The failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment."). A plaintiff asserting a claim that prison officials have failed to protect him from harm must prove that the defendant actually knew of and disregarded an excessive risk of harm to his health and safety. *Hayes*, 84 F.3d at 620. This "reckless disregard" to a plaintiff's health and safety can be proven by evidence establishing "a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. N.Y. City Dep't of Corrs.*, 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted); *see also Hayes*, 84 F.3d at 620 ("[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm."). Said differently, to establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby,

J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)); *see also Farmer*, 511 U.S. at 842 ("[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."); *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988) (finding no realistic opportunity to intervene where "three blows were struck in ... rapid succession"); *accord*, *Henry*, 2011 WL 5975027, at *4. From a constitutional perspective, "deliberate indifference ... requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006); *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

**\*6** In this case, plaintiff has submitted undisputed admissible record evidence establishing that defendant Locke was present when Inmate Heath told defendant Locke and the other corrections officers escorting plaintiff that he did not want plaintiff to be housed in his cell and refused to allow plaintiff entry into the cell. Dkt. No. 1 at 15; Dkt. No. 53-1 at 11; Dkt. No. 63 at 4. In addition, defendant Locke does not dispute that he learned plaintiff was not supposed to be housed in a double-bunk cell prior to placing plaintiff in Inmate Heath's cell. Dkt. No. 53-1 at 16. The undisputed record also reflects that defendant Locke was present when defendant Lieutenant Doe allegedly told plaintiff that he wanted plaintiff to "kick [Inmate Heath's] ass" once he was placed inside the cell. Dkt. No. 1 at 15; Dkt. No. 53-1 at 14-15. Finally, plaintiff contends that, prior to placing plaintiff in Inmate Heath's cell, defendant Locke was aware of Inmate Heath's violent disciplinary history while at Upstate, including the issuance of three Tier III misbehavior reports involving assaults on Inmate Heath's former cellmates. Dkt. No. 63 at 4, 5 & n.2.

11    In my view, this evidence is not hearsay and is properly relied on when analyzing defendant Locke's pending motion. Plaintiff is not relying on the statement made by defendant Lieutenant Doe for the truth of the matter asserted. Instead, plaintiff offers the lieutenant's statement to show defendant Locke's state of mind and that defendant Locke was on notice that plaintiff may be at risk of harm. Accordingly, the statement is not hearsay. *See* Fed. R. Evid. 801(c), Advisory Committee Note ("If the significance of an

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

Case 9:17-cv-01229-DNH-TWD    Document 24    Filed 07/08/19    Page 74 of 91

offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay. ); *accord, United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013); *see also George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay. ).

Although it is not disputed that defendant Locke contacted his supervisors after Inmate Heath refused plaintiff access to his cell, Dkt. No. 53-1 at 12, the accumulation of all of the record evidence gives rise to a genuine dispute of material fact as to whether defendant Locke was aware of a serious risk to plaintiff's health and safety immediately prior to ordering plaintiff to bunk with Inmate Heath, and recklessly disregarded that risk by failing to intervene and stop plaintiff from being housed with Inmate Heath. In my view, reasonable factfinders could disagree as to whether notifying his supervisor of Inmate Heath's conduct but otherwise failing to take any further action to protect plaintiff from impending harm was sufficiently reasonable on defendant Locke's part for purposes of an Eighth Amendment claim, or whether defendant Locke had a realistic opportunity to intervene and prevent the attack on the plaintiff. Accordingly, I recommend defendant Locke's request for summary judgment dismissing the claim asserted against him on the merits be denied.

### 3. Qualified Immunity

Defendant Locke also seeks dismissal of plaintiff's claim against him based on the doctrine of qualified immunity. Dkt. No. 53-5 at 11-12.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S.

at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223).

**\*7** Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Stated differently, a defendant has acted in an objectively unreasonable manner only "when no officer of reasonable competence could have made the same choice

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

Case 9:17-cv-01229-DNH-TWD    Document 24    Filed 07/08/19    Page 75 of 91

in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995).

In this case, even when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, it was objectively reasonable for defendant Locke to believe his acts were lawful. As was discussed above, the record establishes that defendant Locke had no authority to alter plaintiff's cell assignment, and plaintiff does not otherwise contend that defendant Locke should have acted beyond the scope of his authority. Dkt. No. 53-2 at 1. Upon being confronted with Inmate Heath's refusal to permit plaintiff to enter the cell, defendant Locke conferred with his supervisors, who then ordered that he direct plaintiff to enter the cell through the recreational pen door in order to effectuate the housing assignment. Dkt. No. 53-2 at 2; Dkt. No. 63 at 4. These actions, which are not disputed by plaintiff, were within the scope of defendant Locke's duties and approved by supervisors. Dkt. No. 53-2 at 1-3.

**\*8** It was certainly reasonable for defendant Locke to believe he was not violating plaintiff's constitutional rights by notifying his supervisor of a potential risk to plaintiff's safety. It was likewise objectively reasonable for defendant Locke to rely on his superiors' instructions in returning plaintiff to the cell with Inmate Heath because, at a minimum, officers of reasonable competence could disagree as to the legality of defendant Locke's actions in light of this directive from his superiors. *See Anthony v City of New York, et al.*, 339 F.3d 129, 138 (2d Cir. 2003) (" 'Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists.... ' ") (quoting *Bilida v. McCleod*, 211 F.3d 166, 174 75 (1st Cir. 2000); *Kraft v. City of N.Y.*, 696 F.Supp.2d 403, 420 (S.D.N.Y. 2010) (reliance on an "apparently valid" order supports finding of qualified immunity); *cf. Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) (the failure of non-doctors at a prison to intercede in the medical treatment of an inmate in not unreasonable because they lack the authority to intervene in medical decisions). For these reasons, I recommend a finding that defendant Locke is entitled to qualified immunity from suit, and that defendant Locke's motion is granted on this basis.

C. Status of Doe Defendants

On November 30, 2015, plaintiff moved to file an amended complaint to add the names of two defendants previously identified as Sergeant John Doe and Lieutenant John Doe. Dkt. No. 47. In his motion, plaintiff provided the court with only the last name of Sergeant John Doe, and asked the court to order defense counsel to provide him with the name of the lieutenant listed on page 252 of a log book. [2] *Id.*

> [12]     Although plaintiff stated in his letter motion that he had attached the relevant page of the log book, it was not received by the court with plaintiff s filing. *See* Dkt. No. 47.

On December 1, 2015, I denied plaintiff's motion because, pursuant to the court's mandatory pretrial discovery and scheduling order, the deadline for joinder of parties expired on August 2, 2015, and plaintiff failed to show good cause to amend. Dkt. No. 49. Thereafter, defendant Locke filed his motion for summary judgment. Dkt. No. 53. In support of that motion, defendant Locke submitted, *inter alia*, a declaration in which he acknowledges that his "area supervisor, a Sergeant," and the "Watch Commander, a Lieutenant," discussed the situation involving plaintiff and Inmate Heath, after which point the Sergeant "ordered" defendant Locke and two of his fellow officers to escort plaintiff back to the cell occupied by Inmate Heath. Dkt. No. 53-2. Based on defendant Locke's sworn statement, there is no question that at least defendant Locke is aware of the identities of Sergeant John Doe and Lieutenant John Doe. As a result, in the interests of justice, defense counsel is directed to provide plaintiff with the names of these individuals, after which point plaintiff will be granted leave to amend his complaint to add these individuals as defendants in this action. [3] *See Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997).

> [13]     Plaintiff attempted to obtain the names of these defendants while discovery was ongoing. *See* Dkt. Nos. 31, 31 1, 47. Moreover, the undisputed record now shows that defense counsel knew, or could have known with relative ease, the names of Lieutenant Doe and Sergeant Doe. Under such circumstances, the court finds "good cause to amend the scheduling order to allow plaintiff leave to amend the complaint. The court also does not find any bad faith or dilatory motive on the part of plaintiff in seeking to identify these defendants based on the efforts he made during discovery, nor does the court find any undue

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

prejudice to defendants in granting plaintiff leave to amend. *See, e.g., Morales v. County of Suffolk, et al.*, 952 F. Supp.2d 433, 435 436 (E.D.N.Y. 2013) (finding the absence of undue prejudice under similar circumstances because the Doe defendant sought to be added "plainly knew about his involvement in the actions that gave rise to the claim and the need to re open discovery "is not, in itself, sufficient to constitute prejudice "). Because plaintiff remains within the three year limitations period to assert claims against Lieutenant Doe and Sergeant Doe, the court need not decide whether an amendment properly naming these defendants would relate back to the original filing date of the complaint.

**\*9** As it relates to the other Doe Corrections Officers and Nurse Doe, plaintiff has not taken the same steps to identify these unnamed defendants that he took with respect to naming Lieutenant Doe and Sergeant Doe. Indeed, in his motion for leave to amend, he only sought to properly name Lieutenant Doe and Sergeant Doe. *See* Dkt. No. 47.

Dismissal of a claim under Rule 41(b) for failure to prosecute is appropriate "where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has failed to do so. *Jones v. Rock*, No. 12-CV-0447, 2015 WL 791547, at \*21 (N.D.N.Y. Feb. 24, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.) (quotation marks and alteration omitted); *Le Sane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (Rule 41(b) "gives the district court authority to dismiss a plaintiff's case *sua sponte* for failure to prosecute"); *Delrosario v. City of N. Y.*, 07-cv-2027, 2010 WL 882990, at \* 5 (S.D.N.Y. Mar. 4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants"); *Coward v. Town & Vill. of Harrison*, 665 F.Supp.2d 281, 301 (S.D.N.Y. 2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant.").

The court's initial order reviewing plaintiff's complaint permitted plaintiff to proceed with his claims against defendants Corrections Officers Doe 1 and Doe 2, Lieutenant Doe, Sergeant Doe, and Nurse Doe, provided that plaintiff take "reasonable steps through discovery

to ascertain the name of the Doe defendants so as to permit the timely amendment of the complaint and service of process on them." Dkt. No. 14 at 12, 14. That order warned plaintiff, however, as follows: "If plaintiff fails to learn their identities, this action will be dismissed as against the Doe defendants." *Id.* at 12 n.9. The deadline for joining parties to this lawsuit passed on August 2, 2015. Dkt. No. 24 at 5. Discovery in this matter was originally scheduled to close on October 2, 2015. Dkt. No. 24 at 5. That deadline was subsequently extended until December 2, 2015, at defendant Locke's request. Dkt. Nos. 39-40.

It is now more than five months past the extended deadline for joinder of parties, yet, despite the warnings given, plaintiff does not appear to have taken any steps to ascertain the identities of the unnamed Corrections Officers or Nurse. As such, I recommend that the claims brought against these three unnamed defendants be *sua sponte* dismissed without prejudice for failure to prosecute.

## IV. SUMMARY AND RECOMMENDATION

Notwithstanding the existence of a genuine dispute of material fact with respect to whether defendant Locke acted reasonably in ordering plaintiff to bunk with Inmate Heath I find, based upon the record now before the court, that it was objectively reasonable for defendant Locke to believe he was not violating plaintiff's rights when he contacted his supervisor after learning of Inmate Heath's refusal to allow plaintiff in the cell and thereafter followed orders from his supervisors in pursuing plaintiff's housing assignment. Accordingly, I recommend that the court find defendant Locke is entitled to qualified immunity.

**\*10** With respect to Sergeant John Doe and Lieutenant John Doe identified in plaintiff's complaint, I find that the identities of these individuals is known, or can be determined with relative ease, by defense counsel, and that good cause now exists for amending the scheduling order to name these individuals as defendants in this action. As a result, defense counsel is directed to provide plaintiff with the names of these individuals, after which point plaintiff will be granted leave to amend his complaint to add these individuals as defendants in this action.

With respect to the other three Doe defendants identified in plaintiff's complaint, because discovery is now closed and plaintiff has failed to take reasonable steps to identify those individuals and join them in the action, I recommend

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

that the claims asserted against those individuals be dismissed without prejudice for failure to prosecute.

Accordingly, it is hereby respectfully

ORDERED that, within forty-five (45) days of the filing date of this decision and order, defense counsel produce the information specified above regarding the identities of defendant Sergeant John Doe and defendant Lieutenant John Doe. Upon receipt of defense counsel's response, the clerk shall return this file to the court for further review; and it is hereby further

ORDERED, that the clerk adjust the court's records to reflect the correct spelling of defendant's name to N. Locke; and it is hereby respectfully

RECOMMENDED that defendant Locke's motion for summary judgment (Dkt. No. 53) be GRANTED and that plaintiff's claims against defendant N. Locke be DISMISSED, and plaintiff's cross-motion for summary judgment (Dkt. No. 63) be DENIED; and it is hereby further respectfully

RECOMMENDED that plaintiff's claims against defendant Corrections Officer John Doe 1, Corrections Officer John Doe 2, and Nurse Doe be *sua sponte* DISMISSED WITHOUT PREJUDICE.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8735653

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1186569
Only the Westlaw citation
is currently available.

**This decision was reviewed by
West editorial staff and not
assigned editorial enhancements.**

United States District Court,
N.D. New York.

Osmond K. BROWN, Plaintiff,
v.
V. BROWN, Correctional
Officer, Gouverneur
Correctional Facility, Defendant.

No. 9:08-CV-0209 (DNH/GHL).
|
Jan. 19, 2010.

**Attorneys and Law Firms**

Osmond K. Brown, Marcy, NY.

Hon. Andrew M. Cuomo, Attorney General
for the State of New York, Charles
J. Quackenbush, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for
Defendant.

*REPORT-RECOMMENDATION
AND ORDER*

GEORGE H. LOWE, United States
Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action,
commenced pursuant to 42 U.S.C. § 1983,
has been referred to me for Report and

Recommendation by the Honorable David
N. Hurd, United States District Judge,
pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). Osmond K. Brown
("Plaintiff"), an inmate in the custody
of the New York State Department of
Correctional Services ("DOCS"), alleges
that Veronique Brown, a correctional
officer at Gouverneur Correctional Facility,
("Defendant"), violated his constitutional
rights by issuing a false misbehavior report
against Plaintiff in retaliation for Plaintiff
stating his intention to file a grievance.
Currently pending before the Court is
Defendant's motion for summary judgment
pursuant to Federal Rule of Civil Procedure
56. (Dkt. No. 27.) For the reasons that
follow, I recommend that Defendant's
motion be granted.

**I. BACKGROUND**

**A. Summary of Plaintiff's Complaint**

The complaint alleges, in relevant part, [1] as
follows:

On January 31, 2008, at Gouverneur C.F.,
Plaintiff attempted to leave "Protestant
Bible Study" on the "early go back." Dkt.
No. 1 at 4. Defendant would not allow
Plaintiff to leave early. *Id.* Plaintiff informed
Defendant that he would "grieve this issue."
*Id.* In order to retaliate against Plaintiff,
Defendant issued a false misbehavior report
against Plaintiff. *Id* . After a disciplinary
hearing, Plaintiff was found guilty of certain
offenses. Dkt. No. 1 at 4.

Plaintiff filed a grievance, asserting that
Defendant retaliated against Plaintiff by

"writing a fabricated ticket." Dkt. No. 1 at 2. When asked to state the final result of his grievance, Plaintiff wrote, "It[ ] was assigned and coded. However you can't grieve a disciplinary hearing." *Id.*

Plaintiff seeks injunctive and monetary relief. Dkt. No. 1 at 6.

### B. Summary of Grounds in Support of Defendant's Motion

Defendant argues that this action should be dismissed because (1) Plaintiff failed to exhaust his administrative remedies before commencing this action; and (2) Plaintiff is unable to substantiate the retaliation claim. Dkt. No. 27-2. Defendant also argues that she should be shielded from liability for damages based on qualified immunity. *Id.*

### C. Summary of Plaintiff's Response to Defendant's Arguments

In response, Plaintiff argues that he exhausted his administrative remedies, and that there are genuine issues of material fact precluding entry of summary judgment. Dkt. No. 31.

## II. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [2] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [3] In determining whether a genuine issue of material [4] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [5]

## III. ANALYSIS

### A. Exhaustion Requirement

**\*2** The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [6] "[T]he PLRA's exhaustion requirement applies to all inmate suits

about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [7] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program. [8]

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. [9] *First,* an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the CORC within seven (7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a

grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process. [10]

The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. [11] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [12] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [13] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [14]

**\*3** If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

DOCS has a separate and distinct administrative process for inmates to appeal

the result of a disciplinary hearing, which is not referred to as a "grievance" process. In fact, the regulations specifically state that the results of disciplinary hearings are "non-grievable." N.Y. Comp.Codes R. & Regs. tit. 7, § 701.3(e) (1)-(2). Appeals of Tier II dispositions must be made to the Superintendent of the facility. *Id.* at § 253.8.

On January 31, 2008, Plaintiff filed a grievance regarding Defendant's alleged actions. Dkt. No. 27-8, at 13. On February 14, 2008, the Superintendent found no evidence to support Plaintiff's allegations. [15] *Id.* at 6. On the same day, Plaintiff filed the complaint in this action. Dkt. No. 1 at 6. On February 21, 2008, Plaintiff signed an appeal statement, appealing the Superintendent's decision to the CORC. Dkt. No. 27-8 at 6. On March 19, 2008, the CORC upheld the Superintendent's decision. *Id .,* at 4-5. Therefore, Plaintiff commenced this action before he appealed to the CORC. [16] Accordingly, Plaintiff failed to exhaust his administrative remedies before commencing this action.

Plaintiff summarily argues that he exhausted his administrative remedies when the Superintendent "affirmed Plaintiff's hearing" on February 13, 2008. Dkt. No. 31 at 3; *see also* Dkt. No. 1 at 3. Plaintiff appears to be referring to the Superintendent's decision dated February 13, 2008, which affirmed the hearing officer's guilty determination. Dkt. No. 27-9 at 6. However, the Superintendent's determination did not satisfy the PLRA's exhaustion requirement. [17] Moreover, Plaintiff's argument is belied by the fact

that Plaintiff appealed the Superintendent's February 14, 2008 determination regarding his grievance to the CORC. Dkt. No. 27-8, at 6. Accordingly, Plaintiff's argument is unavailing.

I also note that with regard to the three-part inquiry set forth in *Hemphill,* first, an administrative remedy was available to Plaintiff. [18] Plaintiff expressly stated that there was a prisoner grievance procedure at Gouverneur C.F. through which he filed a grievance. Dkt. No. 1 at ¶ 4. Thus, Plaintiff had available to him an administrative remedy which should have been pursued to completion before filing the instant action.

Second, Defendant is not estopped from asserting the exhaustion defense. [19] Here, Plaintiff alleges no facts suggesting that Defendant took any actions that inhibited Plaintiff from exhausting his available administrative remedies before commencing this action.

Third, Plaintiff has not alleged special circumstances justifying his failure to exhaust his administrative remedies before commencing this lawsuit. [20] Plaintiff has not alleged that he was laboring under any sort of physical infirmity, or reasonable misunderstanding of the law. Therefore, Plaintiff's failure to exhaust his administrative remedies before commencing this action is not justified.

**\*4** Moreover, the exhaustion of Plaintiff's grievance after this suit was filed is insufficient. In *Neal v. Goord,* the Second Circuit held that "[s]ubsequent exhaustion

after suit is filed ... is insufficient." *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The Court explained as follows:

> [A]llowing prisoner suits to proceed, so long as the inmate eventually fulfills the exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court. Moreover, contrary to [the plaintiff's] argument of judicial inefficiency, if during the pendency of a suit, the administrative process were to produce results benefitting plaintiff, the federal court will have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset.

*Id.* at 123. In other words, "The fact that a grievance is filed, or the process is completed, subsequent to commencement of suit will not salvage an otherwise premature filing." *Chalif v. Spitzer,* No. 9:05-CV-1355, 2008 WL 1848650, at *13 (N.D.N.Y. Apr.23, 2008) (Kahn, J., adopting Report-Recommendation of Peebles, M.J. in which the plaintiff's claim was subject to dismissal

because exhaustion had not occurred at the time the action was filed) (citing *Neal,* 267 F.3d at 122).

Accordingly, I recommend that the complaint be dismissed without prejudice to re-filing.[21] While this may not be the most efficient result, as noted in *Mendez v. Artuz:*

> [T]he Court of Appeals has ruled that from the broader perspective of Congress and appellate judges, the greater good forbids allowing a case to proceed where administrative remedies have been exhausted while the complaint is pending, and requires in such a case dismissal of the complaint, to be re-filed, if the plaintiff wishes, with the addition of paragraphs explaining how administrative remedies have been exhausted.

No. 01 CIV. 4157, 2002 WL 313796, at *2 (S.D.N.Y. Feb.27, 2002) (holding that prisoner failed to exhaust administrative remedies when he commenced civil rights action before receiving decision from the CORC) (citing *Neal,* 267 F.3d at 123). Thus, Defendant's motion for summary judgment should be granted in this regard.

## B. FALSE MISBEHAVIOR REPORT

"[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary

hearing." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862.

 **\*5** To state a claim for retaliation, a plaintiff must plead facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

Once the plaintiff's burden of proving the three-part test is satisfied, "the burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citing *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)). Thus, under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham,* 89 F.3d at 79 (citations omitted).

### 1. Conduct

Plaintiff essentially argues that his stated intent to file a grievance was constitutionally protected conduct. Dkt. No. 31. Defendant argues that a "statement of intent to file a grievance is not 'protected' speech or conduct [ ] for § 1983 purposes." Dkt. No. 27-2 at 8.

The filing of a grievance against prison officials is constitutionally protected conduct. *Scott v. Coughlin,* 344 F.3d 282, 288 (2d Cir.2003); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Similarly, an inmate's stated intent to file a grievance has been treated as protected conduct. For instance, in *Coleman v. Beale,* an inmate made oral statements to an alcohol and substance abuse treatment program assistant regarding the inmate's intent to file grievances against the assistant. *Coleman v. Beale,* 636 F.Supp.2d 207, 210-11 (W.D.N.Y.2009). The inmate subsequently filed grievances against the assistant. *Id.* The court held, and defendants conceded, that the inmate's "filing of grievances was constitutionally protected, as were his statements to [the assistant] that he intended to file grievances against her." *Id.* at 211 (citing *Davis v. Goord,* 320 F.3d 346, 352-53 (2d Cir.2003) ("the filing of prison grievances is a constitutionally protected activity"); *Shine v. Hofman,* 548 F.Supp.2d 112, 121 (D.Vt.2008); and *Williams v. Ingraham,* No. 04CV257, 2005 WL 3746222, at \*2 (N.D.N.Y. Feb. 3, 2005) ("The [inmate's] conduct at issue-complaints to judicial officials, filing a lawsuit, and grievances-are clearly constitutionally protected rights")). Likewise, in *Shine v. Hofman,* the court treated an inmate's stated intent to file a

grievance as protected conduct. *Shine,* 548 F.Supp.2d at 121. Accordingly, Plaintiff's stated intent to file a grievance was protected conduct.

### 2. Adverse Action

**\*6** Plaintiff alleges that as a result of the false misbehavior report, he was held in the Special Housing Unit ("SHU") for thirty (30) days. Dkt. No. 31 at 7. Defendant appears to argue, in a footnote, that Plaintiff failed to allege that Defendant took any adverse action *after* Plaintiff filed his grievance; therefore Plaintiff has not established this element. Dkt. No. 27-2, at 11, n. 15.

However, as discussed above, I will treat Plaintiff's stated intent to file a grievance as protected conduct. Again, Plaintiff alleges that Defendant issued a false misbehavior report against Plaintiff after he stated his intention to file a grievance. Dkt. No. 1. As a result of the misbehavior report, Plaintiff was held in SHU for thirty (30) days. Dkt. No. 31 at 7. The filing of a false misbehavior report that results in a SHU sentence is an example of "adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 383-84 (2d Cir.2004). Therefore, Plaintiff has alleged that Defendant took adverse action.

### 3. Substantial or Motivating Factor

Plaintiff must now show that the protected conduct was the "substantial motivating factor," resulting in the adverse action. *Bennet v. Goord,* 343 F.3d at 137.

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (I) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation. *Id.* (citing *Colon,* 58 F.3d at 872-73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

Regarding temporal proximity, "[a] plaintiff can establish a casual connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citations omitted). No bright line test has been drawn " 'to define the outer limits beyond which a temporal relationship is too attenuated to establish a casual relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.' " *Id.* (quoting *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001)). The Second Circuit held that the passage of "only six months" between the dismissal of a prisoner's lawsuit and an allegedly retaliatory beating by officers, one of whom was a defendant in the prior lawsuit, is sufficient to support an inference of a casual connection. *Id.* (citing *Gorman-Bakos,*

252 F.3d at 555 (suggesting the lapse of five months between protected activity and retaliation may show a casual connection).

**\*7** Here, Plaintiff alleges that he received the false misbehavior report the day after the alleged incident. Dkt. No. 31 at ¶ 10. Therefore, the timing of the filing of the misbehavior report provides some support for an inference that the protected conduct played a part in the filing.

Regarding the vindication factor, vindication of the inmate after a hearing may constitute circumstantial evidence of a defendant's retaliatory motive. *Gayle,* 313 F.3d at 683 ("A false reason for the report's issuance would support the inference that the real reason was the improper one: retaliation."). Here, Plaintiff was charged with violating Rule 104.11 (Violent Conduct); Rule 104.13 (Creating a Disturbance); Rule 107.10 (Interference with Employee); Rule 106.10 (Refusing Direct Order); and Rule 102.10 (Threats). Dkt. No. 27-9 at 1. Plaintiff was found not guilty of a majority of the charges, specifically Rule 104.11 (violent conduct); Rule 107.10 (Interference with Employee); and Rule 102.10 (Threats). Thus, he was found guilty of violating only Rule 104.13 (creating a disturbance) and Rule 106.10 (Refusing Direct Order). *Id.* Accordingly, Plaintiff's partial vindication weighs somewhat in his favor. [22]

Regarding statements made by Defendant, Plaintiff claims the following: He attempted to leave the bible study group "on the early go-back." Dkt. No. 31 at ¶ 4. Defendant told Plaintiff to go back to the chapel because "Protestant Bible Study never goes back early on her shift." *Id.* at ¶ 5. As Plaintiff walked to the chapel, he stated, " 'Rules are always changing on Thursday night and I will grieve this.' " *Id.* at ¶ 6. Defendant entered the chapel and ordered Plaintiff to return to her desk, which Plaintiff did. Dkt. No. 31 at ¶ 7. Defendant asked Plaintiff why he threatened her. *Id.* at ¶ 8. Plaintiff denied threatening Defendant. *Id.* Defendant then stated, **" 'I'll teach you to threaten me.' "** *Id.* at ¶ 9 (emphasis added). Defendant called "Sgt. Leone," who escorted Plaintiff to SHU. *Id.* The next day, Plaintiff received the false misbehavior report. *Id.* at ¶ 10.

Similarly, at the disciplinary hearing, Plaintiff described the incident as occurring, in part, as follows:

> C.O. Brown entered and called me out of the chapel to her desk. She said [,] ["][W]hy did you threaten me["]? I said[,] ["I never threatened you.["] She told me to have a seat on the bench. She said[,] **["]I'll teach you to grieve me.["]**

Dkt. No. 27-9 at 12 (emphasis added).

Further, at Plaintiff's deposition, Plaintiff stated that after Defendant ordered Plaintiff to leave the chapel, Defendant stated, **["] I'm going to teach you to grieve me.["]** She got on the telephone, she called Sergeant Leone

and said [']I have an Inmate Brown here who just threatened me.['']" Dkt. No. 27-14 at 35 (emphasis added). In light of the foregoing, I find that it would be reasonable to infer from Defendant's alleged statements that she may have acted with a retaliatory motive.

 **\*8** Viewing the evidence in the light most favorable to Plaintiff, I find that there is a genuine issue of material fact as to whether retaliation was a substantial or motivating factor in Defendant's filing of the misbehavior report. *See Ahlers v. Grygo,* No. 02-CV-3256, 2009 WL 691927, at \*7 (E.D.N.Y. Mar.13, 2009) (finding that it would be reasonable to infer from a correction officer's statements, including "what goes around, comes around," and "payback is a bitch," that he was threatening retribution against prisoner) (citing *Colon,* 58 F.3d at 873 (holding that disparity between the affidavits of a prisoner and corrections officer "itself creates a credibility issue that is not readily amenable to resolution on summary judgment")).

### 4. Basis for Adverse Action
Defendant argues that even if Plaintiff could show that an improper motive played a substantial part in her "disciplinary action," she "could have taken exactly the same action absent the improper motive." Dkt. No. 27-2 at 11.

Even if an inmate plaintiff meets his burden under this three-pronged test, a defendant is entitled to summary judgment if she can demonstrate that she would have taken the same action against the plaintiff absent any retaliatory motivation. *See Gayle,* 313

F.3d at 682. "At the summary judgment stage, if the **undisputed facts** demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." *Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999) (per curiam) (emphasis added). Courts employ a " 'presumption that a prison official's acts to maintain order are done for a proper purpose.' " *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.) (quoting *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995)), cert. denied, 525 U.S. 907 (1998). Thus, " '[t]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage.' " *Hynes,* 143 F.3d at 657 (quoting *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994)).

Plaintiff argues that he obeyed all orders, and was not violent, aggressive, or loud. Dkt. No. 31 at 4. He also states that he created no disturbance and made no threats. *Id.* For support, Plaintiff claims that a correctional officer testified at the disciplinary hearing that he heard the exchange between the parties; that there was no noise or yelling; and that Defendant lied. *Id.* at 6. Plaintiff also claims that the exchange was witnessed by another inmate, who apparently will support Plaintiff's position. *Id.*

Defense counsel argues that Defendant's "account of the event must control" because the Appellate Division, Third Department, confirmed the guilty determination during

an Article 78 proceeding commenced by Plaintiff.[23] Dkt. No. 27-2 at 10. However, Defendant's "account of the event" is unknown, since Defendant filed no affidavit or declaration. Moreover, it is unclear if counsel is referring to Defendant's unsworn account of the events as set forth in the misbehavior report, (Dkt. No. 27-9, at 5), or to her unsworn testimony at the disciplinary hearing, (Dkt. No. 27-9, at 10-31), or to both.

**\*9** In any event, it is therefore disputed whether Plaintiff committed the prohibited conduct. Accordingly, at this stage of the proceeding Defendant has not met her burden of establishing that she would have filed the misbehavior report even in the absence of the protected conduct.[24] The credibility of the witnesses and the weight of the evidence are issues within the province of the jury, and not for the Court to decide on summary judgment.[25]

Moreover, as noted, it is the moving party's burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Defendant has failed to carry her burden. For instance, the only pieces of "evidence" to which Defendant points to show an absence of a genuine issue of material fact regarding the "substantial or motivating factor" analysis are (1) a statement or statements made by Plaintiff during his deposition, which Defendant claims is a concession by Plaintiff that inmates cannot "indulge" in "rebellious behavior;" and the (2) Appellate Division's decision confirming the guilty findings. Dkt. No. 27-2, at 10-11. This "evidence" does

not establish the absence of a genuine issue of material fact. Accordingly, I would recommend denying Defendant's motion for summary judgment in this regard. However, because Plaintiff failed to exhaust administrative remedies before commencing this action, Defendant's motion should be granted.

### C. QUALIFIED IMMUNITY

Defendant argues that she is shielded from liability for damages based on qualified immunity. Dkt. No. 27-2 at 11. Plaintiff does not specifically address the issue, but argues in general that Defendant's motion should be denied. Dkt. No. 31.

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* --- U.S. ----, ----, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 812, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A determination of this issue involves deciding whether the facts that a plaintiff has alleged, or shown, make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *Pearson,* 129 S.Ct. at 815-16 (citing *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

"A right is sufficiently clearly established if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Higazy v. Templeton,* 505

F.3d 161, 169, n. 8 (2d Cir.2007) (quoting *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). The following three factors are considered when determining whether a particular right was clearly established at the time a defendant acted:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*10** *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[26] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy,* 505 F.3d at 169-70 (citations omitted).[27] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). As the Supreme Court has explained,

> [T]he qualified immunity defense ... provides ample protection to all but

the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.

However, when "there are facts in dispute that are material to a determination of reasonableness," dismissal on the basis of a qualified immunity defense is inappropriate. *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999); *Ali v. Szabo,* 81 F.Supp.2d 447, 461 (S.D.N.Y.2000) ("The Court cannot conclude as a matter of law that [the officers'] conduct was objectively reasonable since there are material issues of fact as to whether [plaintiff] was obeying the officers' order and who started the physical confrontation.").

There are genuine issues of material fact regarding Plaintiff's retaliation claim. Accordingly, I would recommend in favor of denying Defendant's motion in this regard.[28] However because Plaintiff failed to exhaust administrative remedies before commencing this action, Defendant's motion should be granted.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 27) be **GRANTED** and the complaint be **DISMISSED** without prejudice to re-filing; and it is further

**ORDERED** that the Clerk serve copies of the electronically-available-only decisions cited in this Report-Recommendation & Order on Plaintiff. [29]

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

## All Citations

Not Reported in F.Supp.2d, 2010 WL 1186569

## Footnotes

1    The complaint contains allegations against Lt. Don, the hearing officer who found Plaintiff guilty of certain offenses. Dkt. No. 1. Lt. Don was dismissed as a party to this action on March 10, 2009 when the Honorable David N. Hurd, U.S. District Judge, granted, in part, a motion for judgment on the pleadings filed by Lt. Don and V. Brown. Dkt. No. 23. Therefore, allegations against Lt. Don have been omitted.

2    *Matsushita,* 475 U.S. at 585-86; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

3    *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

4    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

5    *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

6    42 U.S.C. § 1997e.

7    *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

8    7 N.Y.C.R.R. § 701.7.

9    7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

10   7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.2d 680 (2d Cir.2004); *see, e.g., Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

11   *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford. Chavis v. Goord,* No. 07-4787-pr, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

12   *Hemphill,* 380 F.3d at 686 (citation omitted).

13   *Id.* (citations omitted).

14   *Id.* (citations and internal quotations omitted).

15    As noted, generally, the Superintendent reviews an appeal of an IGRC decision. In this case, the record contains no decision from the I.G.R.C.

16    During his deposition, Plaintiff acknowledged that he commenced this action before he received a final decision from the CORC. Dkt. No. 27-14, at 67.

17    *See Black v. Selsky,* No. 01-CV-0155E, 2004 WL 625621, at *3 (W.D.N.Y. Jan.13, 2004) (holding that the plaintiff's completion of the disciplinary appeal process regarding the charges in misbehavior reports did not satisfy the PLRA's exhaustion requirement, and noting that the present § 1983 claims, which included allegations of staff misconduct related to those incidents giving rise to the discipline, must be grieved separately) (citing *Scott v. Gardner,* 287 F.Supp.2d 477, 489 (S.D.N.Y.2003) (holding that although the plaintiff completed the disciplinary appeal process with regard to a misbehavior report, the plaintiff had not exhausted his administrative remedies because he had not filed a separate grievance, and noting that "allegations of staff misconduct related to the incidents giving rise to the discipline must be grieved"); and *McCoy v. Goord,* 255 F.Supp.2d 233, 256 (S.D.N.Y.2003) (holding that the plaintiff's contention that he exhausted his administrative remedies because he appealed a disciplinary hearing was without merit, and that "[a]n appeal of the disciplinary hearing determination does not satisfy the PLRA's exhaustion requirement") (citation omitted)).

18    To be "available" for purposes of the PLRA, an administrative remedy must afford "the possibility of some relief for the action complained of." *Booth v. Churner,* 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). In addition, a court deciding this issue must apply an objective test and determine whether a similarly situated person of ordinary firmness would have deemed the administrative remedy available. *Hemphill,* 380 F.3d at 688.

19    A defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 162-63 (2d Cir.2004) (district court directed to consider whether defendants were estopped from asserting exhaustion defense where inmate alleged that he was beaten, threatened, denied grievance forms, and transferred to another prison). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008).

20    Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004).

21    *See Torres v. Caron,* No. 9:08-CV-0416, 2009 WL 5216956, at *6-7 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J., adopting Report-Recommendation of Lowe, M.J.) (same result reached).

22    *See Ahlers v. Grygo,* No. 02-CV-3256, 2009 WL 691927, at *8 (E.D.N.Y. Mar.13, 2009) (holding that the plaintiff adduced sufficient evidence to create a genuine issue of material fact on the issue of retaliatory intent where, *inter alia,* the plaintiff was vindicated at a hearing as to one of the charges).

23    To the extent that Defendant is arguing that Plaintiff should be collaterally estopped from asserting his retaliation claim, this argument is unavailing. Defendant vaguely claims that "[i]n *Brown v. Taylor, et al,* the plaintiff presented the same factual allegations as in this action. *Inter alia* he argued that C.O. Brown had issued a 'retaliatory' misbehavior report and set forth an array of reasons why her testimony should not have been credited." Dkt. No. 27-2 at 11.

First, I note that the action was brought against **only** Justin Taylor, Superintendent of Gouverneur C.F. Dkt. No. 27-9 at 1; Dkt. No. 27-10, at 6, 7; Dkt. No. 27-12 at 1. Therefore, the reference to *"Brown v. Taylor, et al"* is incorrect.

Second, Defendant has failed to clearly establish that the retaliation claim was actually raised and decided in that proceeding. In her memorandum of law, Defendant cites *Colon v. Coughlin,* in which the court noted that "the doctrine of issue preclusion only applies if (1) **the issue in question was actually and necessarily decided in a prior proceeding,** and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir.1995) (citation omitted) (emphasis added). "Issue preclusion will apply only if it is **quite clear** that these requirements have been satisfied, lest a party be 'precluded from obtaining at least one full hearing on his or her claim.' " *Id.* (citation omitted) (emphasis added). "The party asserting issue preclusion bears the burden of showing that the identical issue was previously decided." *Id.* (citation omitted). Here, Defendant has not clearly established that the retaliation claim was raised and actually and necessarily decided. Therefore, to the extent that Defendant is arguing that collateral estoppel should apply, this argument is unavailing.

24    *See Gayle,* 313 F.3d at 684 (holding that the prison officials at the summary judgment stage failed to meet their burden of establishing as a matter of law that the prisoner "would have been punished to the same extent he was punished in the absence of a retaliatory motive" where it was *disputed* whether the prisoner "committed all of the prohibited conduct, and, more important, whether he committed the most serious of the conduct-threatening to instigate inmate unrest"); *see also Ashley v. Wakefield,* 367 F.Supp.2d 461, 468 (W.D.N.Y.2005) (holding that the prison officers did not satisfy their

burden of showing that they would have taken the same adverse actions even in the absence of the prisoner's protected activities where the prisoner denied engaging in the alleged conduct).

25    *See Ashley,* 367 F.Supp.2d at 468 (citing *Graham,* 89 F.3d at 81 (finding that the plaintiff's "punishment was either wholly retaliatory or it was not retaliatory at all. This question rises to matters of credibility and weight of the evidence, which are matters for the jury."); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (finding that summary judgment was inappropriate where there was evidence of admission of retaliatory motive by defendants and circumstantial evidence based on temporal proximity between grievance and retaliation); *Jones v. Coughlin,* 45 F.3d 677, 680 (2d Cir.1995) (stating that "determinations as to whether to credit such testimony and as to what inference to draw from the sequence of events is within the province of the factfinder at trial on the retaliation claims, not of the court on a motion for summary judgment.")).

26    *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

27    *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

28    *See Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) ( "[S]ummary judgment based either on the merits or on qualified immunity requires that no disputes about material facts remain.") (citations omitted); *Deal v. Yurack,* No. 9:04-CV-0072, 2007 WL 2789615, at *14 (N.D.N.Y. Sept.24, 2007) (Kahn, J., adopting Report-Recommendation of Peebles, M.J., finding that whether "the defendants maintained a good faith belief that their actions did not violate clearly established rights depends on the resolution of fact issues similar to those identified as precluding entry of summary judgment on the merits of plaintiff's retaliation and excessive force claims. As such ... the court is not currently positioned to determine defendant's entitlement to qualified immunity."); *see also Jeanty v. County of Orange,* 379 F.Supp.2d 533, 542 (S.D.N.Y.2005) ("[T]he same genuine issues of material fact that preclude summary judgment on plaintiff's excessive force claim, also preclude application of the defense of qualified immunity at the summary judgment stage."); *Dellamore v. Stenros,* 886 F.Supp. 349, 352 (S.D.N.Y.1995) (finding that material factual disputes exist on the issue of qualified immunity for the same reasons that the court denied the motion for summary judgment on the plaintiff's Eighth Amendment excessive force claim).

29    The decisions include: *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177 (W.D.N.Y. Mar.29, 2004); *Chavis v. Goord,* No. 07-4787-pr, 2009 WL 1803454 (2d Cir. June 25, 2009); *Black v. Selsky,* No. 01-CV-0155E, 2004 WL 625621 (W.D.N.Y. Jan.13, 2004); *Chalif v. Spitzer,* No. 9:05-CV-1355, 2008 WL 1848650 (N.D.N.Y. Apr.23, 2008); *Torres v. Caron,* No. 9:08-CV-0416, 2009 WL 5216956 (N.D.N.Y. Dec.30, 2009); *Mendez v. Artuz,* No. 01 CIV. 4157, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002); *Williams v. Ingraham,* No. 04CV257, 2005 WL 3746222 (N.D.N.Y. Feb. 3, 2005); *Ahlers v. Grygo,* No. 02-CV-3256, 2009 WL 691927 (E.D.N.Y. Mar.13, 2009); and *Deal v. Yurack,* No. 9:04-CV-0072, 2007 WL 2789615 (N.D.N.Y. Sept.24, 2007).

---

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.